IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38349-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CURTIS BRIAN FISHER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

COONEY, J. — Curtis Fisher was 17 years of age in 1979 when he was sentenced to 11.75 years to life in prison for second degree murder. Following our Supreme Court's decision in *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), Mr. Fisher filed a CrR 7.8 motion to vacate his sentence. Without the benefit of the recent Supreme Court decisions in *In re Personal Restraint of Williams*, 200 Wn.2d 622, 520 P.3d 933 (2022), and *In re Personal Restraint of Forcha-Williams*, 200 Wn.2d 581, 520 P.3d 939 (2022), the trial court granted Mr. Fisher's motion and ordered "a full resentencing hearing." Clerk's Papers (CP) at 743-44.

The State appeals.

BACKGROUND

Mr. Fisher was born on March 5, 1962. On August 13, 1979, Mr. Fisher, who was 17 years old at the time, and three others traveled to an area near the Yakima River.

Among the quartet was John Rice, who was allegedly financially indebted to Mr. Fisher. At some point, an altercation erupted and Mr. Fisher obtained a firearm that had been in Mr. Rice's possession. Assisted by his two accomplices, Mr. Fisher forced Mr. Rice to kneel on the ground. Mr. Fisher then shot Mr. Rice in the chest. After being shot, Mr. Rice ran from Mr. Fisher and his companions. Mr. Fisher chased after Mr. Rice, firing additional shots. Eventually, Mr. Rice fell near the Yakima River's edge and expired.

The State charged Mr. Fisher with first degree murder. Following a declination hearing, the juvenile court remanded Mr. Fisher to the superior court to be tried as an adult. In declining jurisdiction, the juvenile court found that Mr. Fisher had not been living at home, was employed, was not attending school, and that he appeared to be taking care of himself while away from home. The juvenile court further found that Mr. Fisher, "appear[ed] to behave in a mature manner when with adults and to behave in an immature manner when with younger people." CP at 23.

On September 18, 1979, Mr. Fisher pleaded guilty to second degree murder. In the statement of defendant on plea of guilty, Mr. Fisher acknowledged that he could be sentenced to a maximum of 20 years to life of imprisonment. The statement further reflected his understanding that the State would recommend the court order a life sentence. Ultimately, the trial court sentenced Mr. Fisher to a minimum of 13 years and a maximum term of life imprisonment, subject to review by the Board of Prison Terms and Paroles.

Following the implementation of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, "[a] 1400 Progress Review was conducted [by the Indeterminate Sentencing Review Board (ISRB)] and Mr. Fisher's minimum term was set at 141 months [11.75 years]." CP at 8. At a later "parolability hearing," Mr. Fisher was found "not parolable" and 60 months were added to his sentence. CP at 8. In 1990, Mr. Fisher unsuccessfully challenged the ISRB's decision in a personal restraint petition (PRP) filed with this court. In denying the petition, we held that RCW 9.95.100 prohibited the parole board from releasing an inmate prior to their maximum term unless the offender's rehabilitation had been completed and the offender was fit for release.

In 2014, Mr. Fisher filed another PRP, this time citing the United States Supreme Court's opinion in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). We dismissed the petition, finding that the PRP was a mixed petition and that Mr. Fisher failed to meet any of the time bar exceptions of RCW 10.73.100(1)-(6).

In 2019, Mr. Fisher again appeared before the ISRB. Following a hearing, the ISRB determined Mr. Fisher was "not parolable and 36 months were added to his minimum term." CP at 156. The ISRB found that Mr. Fisher had a high level of psychopathy, severe antisocial disorder, and had a high risk of reoffending. The ISRB further justified the denial of Mr. Fisher's release due to his strong involvement in gang activity and his role as an organizer of a prison drug distribution scheme.

No. 38349-1-III
*State v. Fisher*

PROCEDURE

In 2020, Mr. Fisher filed a "CrR 7.8 Motion to Vacate and Set Aside Judgment and Sentence" in the Yakima County Superior Court. CP at 16 (some capitalization omitted). Mr. Fisher argued that state and federal appellate court decisions amounted to a significant change in the law and therefore constituted an exception to the one-year time bar limitation of RCW 10.73.090(1).[1] Mr. Fisher asserted that, in adherence to recent case law, the trial court was required to consider the mitigating qualities of his youth before it sentenced him. The State argued that Mr. Fisher's motion was time barred.

The trial court commented, "[T]his issue as a matter of first impression, having been unable to locate case law directly on point." CP at 743. It then concluded Mr. Fisher's motion was not time barred because *Houston-Sconiers* represented a significant change in the law. Accordingly, the court granted Mr. Fisher's motion and ordered a full resentencing. In reaching its decision, the trial court found that *Houston-Sconiers* applied retroactively despite Mr. Fisher being sentenced prior to the enactment of the SRA. Absent from the trial court's findings of fact, conclusions of law, and order is any

---

[1] *See Miller*, 567 U.S. 460; *Houston-Sconiers*, 188 Wn.2d 1; *In re Pers. Restraint of Ali*, 196 Wn.2d 220, 474 P.3d 507 (2020); *In re Pers. Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 474 P.3d 524 (2020); *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

4

mention of Mr. Fisher being actually and substantially prejudiced by the sentencing court's alleged deficiencies.

The State timely appeals.[2]

## ANALYSIS

On appeal, the State argues, among other contentions, that the trial court abused its discretion in finding there had been a significant change in the law material to Mr. Fisher's sentence, in concluding Mr. Fisher's motion was not time barred, and in neglecting to enter findings as to whether Mr. Fisher had been actually and substantially prejudiced by the alleged deficiencies of the sentencing court.

We hold that the trial court applied the incorrect legal standard when it found there had been a significant change in the law material to Mr. Fisher's sentence, when it concluded that Mr. Fisher's motion was not time barred, and when it granted the motion absent a finding that Mr. Fisher was actually and substantially prejudiced by the alleged error. Accordingly, we reverse.

---

[2] During the pendency of this appeal, the ISRB held another hearing on Mr. Fisher's parolability. The ISRB found that Mr. Fisher's risk of reoffending had not changed from the 2019 assessment, that Mr. Fisher had committed two serious infractions since 2022 (physical contact with another inmate and testing positive for opiates, THC, and methamphetamine), recognized Mr. Fisher's potential ties with white supremacist groups in prison, and noted that Mr. Fisher's psychological evaluation found him to be a moderate to high risk for violent recidivism and that he was a questionable candidate for release. The ISRB concluded Mr. Fisher was not parolable and added an additional 36 months to his minimum term.

LEGAL PRINCIPLES

We review a trial court's ruling on a CrR 7.8 motion for abuse of discretion. *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012). A trial court abuses its discretion if its decision is "'manifestly unreasonable or based upon untenable grounds or reasons.'" *Id*. (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). A court's decision "'is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirement of the correct standard.'" *Id*. (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). The untenable grounds basis applies if the factual findings are unsupported by the record. *Id*. A court's decision is "'manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard.'" *Id*.

TIME BAR

The State contends Mr. Fisher's CrR 7.8 motion for postconviction relief is time barred because *Houston-Sconiers* is not material to his sentence. We agree.

A collateral attack is any form of "postconviction relief other than a direct appeal." RCW 10.73.090(2). When an offender brings a CrR 7.8 motion to collaterally attack a judgment, it will be governed by the same rules as collateral attacks filed with this court. *State v. Hubbard*, 1 Wn.3d 439, 451, 527 P.3d 1152 (2023). Therefore, the one-year time limit on collateral attacks of a judgment and sentence is applicable to CrR 7.8 motions. *Id*. (citing RCW 10.73.090). RCW 10.73.100 provides multiple exceptions to RCW

6

10.73.090's one-year time bar. Here, the trial court found that under RCW 10.73.100(6), *Houston-Sconiers* represented a significant change in the law material to Mr. Fisher's sentence.

The Washington State Supreme Court declared that the procedural mandates of *Houston-Sconiers*—requiring that trial courts consider the mitigating qualities of youth at sentencing and have discretion to impose a downward sentence—are not independently retroactive on appeal. *Williams*, 200 Wn.2d at 632. Procedural challenges are those "'designed to enhance the accuracy of a [conviction or] sentence by regulating the manner of determining the defendant's culpability.'" *Id*. at 630 (internal quotation marks omitted) (quoting *Montgomery v. Louisiana*, 577 U.S. 190, 201, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016)). The Supreme Court established two procedural rules to assist courts with this objective. *In re Pers. Restraint of Ali*, 196 Wn.2d 220, 236-37, 474 P.3d 507 (2020). "First, sentencing courts must consider the mitigating qualities of youth, and second, they must have discretion to impose sentences below the SRA adult standard ranges." *Williams*, 200 Wn.2d at 630 (citing *Houston-Sconiers*, 188 Wn.2d at 21).

Unlike procedural challenges, the substantive rule established in *Houston-Sconiers* is retroactive and must be considered on collateral review. *Ali*, 196 Wn.2d at 236. A substantive challenge is one where the "'[s]ubstantive rules . . . set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose.'" *Id.* at 237 (alteration in original) (quoting

7

*Montgomery*, 577 U.S. at 201). *Houston-Sconiers* recognized a category of punishments that are beyond the State's power to impose—"adult standard SRA ranges and enhancements that would be disproportionate punishment for juveniles who possess diminished culpability." *Id*. Accordingly, for *Houston-Sconiers* to be applied retroactively, a petitioner who brings a procedural challenge to an indeterminate sentence must also assert a substantive challenge. *Id.* at 240.

Here, Mr. Fisher presents a procedural challenge (that the sentencing court failed to consider the mitigating factors of his youth) as well as a substantive challenge (that his sentence constitutes disproportionate punishment of a juvenile offender). Although Mr. Fisher's claimed substantive challenge leans in favor of the retroactive application of *Houston-Sconiers*, we are not persuaded by the argument.

In *Forcha-Williams*, 200 Wn.2d at 596, the Supreme Court analyzed whether *Houston-Sconiers*'s directive, that a sentencing court has the discretion to impose a sentence below an adult standard range, applies to the maximum term of an indeterminate sentence. In doing so, the Supreme Court distinguished that the low end of a determinate sentence, because it represents the mandatory amount of time an offender must serve, from the maximum term of an indeterminate sentence. *Id*. at 597. The *Forcha-Williams* court concluded that the maximum term of an indeterminate sentence does not create a risk of disproportionate punishment because the offender is not mandated to serve the

maximum term. *Id.* Rather, "an indeterminate sentence provides an opportunity for release to those who demonstrate rehabilitation." *Id*.

Mr. Fisher asks us to retroactively review his term of confinement and find it disproportionate for a juvenile offender. We decline the request. The prison time Mr. Fisher has served beyond the minimum determinate sentence of 11.75 years is directly tied to his lack of rehabilitation. Periods of incarceration that are directly tied to an offender's rehabilitation do no implicate concerns of facial disproportionality. *Id*. at 598.

Mr. Fisher's argument that he received a disproportionate sentence does not amount to a substantive challenge. Based on the absence of a successful substantive challenge, the trial court abused its discretion in finding "that there has been a significant and material intervening change in the law." CP at 743. Consequently, Mr. Fisher's collateral attack against his sentence is time barred under RCW 10.73.090(1).

ACTUAL AND SUBSTANTIAL PREJUDICE

The State contends the trial court abused its discretion in granting Mr. Fisher's CrR 7.8 motion without a finding of actual and substantial prejudice. We agree.

"A petitioner must demonstrate by a preponderance of the evidence that he was actually and substantially prejudiced by the constitutional error in order to obtain relief on collateral review." *In re Pers. Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 267, 474 P.3d 524 (2020). Prejudice may be established if the petitioner can show by a preponderance of the evidence that the sentence they received would have been shorter if

9

the sentencing judge had complied with *Houston-Sconiers*. *Forcha-Williams*, 200 Wn.2d at 599. One factor used to determine the existence of prejudice is whether there is evidence that the sentencing judge was willing to consider mitigating factors that justify a lower sentence. *Id*. at 603. However, such a procedural *Houston-Sconiers* violation alone does not establish prejudice. Rather, a procedural *Houston-Sconiers* error must be accompanied by other evidence showing the sentencing judge would have imposed a lesser sentence. *Id*.

Here, not only did the trial court fail to make any findings related to prejudice, Mr. Fisher neglected to even allege that he suffered actual and substantial prejudice due to the sentencing court's alleged deficiencies. On review, Mr. Fisher asserts that his grossly disproportionate sentence constitutes actual and substantial prejudice.

Mr. Fisher is not serving a grossly disproportionate sentence for a juvenile offender. The trial court imposed a determinate sentence of 13 years that was later reduced to 11.75 years. Any subsequent period of incarceration beyond the 11.75 years has been directly tied to Mr. Fisher's lack of rehabilitation. Further, Mr. Fisher failed to establish that the sentencing court did not consider mitigating factors of his youth. To the contrary, approximately two weeks prior to his sentencing, the trial court found:

> That the juvenile appears to be mature for his age at times while at other times he appears to be immature. That the juvenile appears to behave in a mature manner when with adults and to behave in an immature manner with younger people. That immediately prior to the commission of the alleged criminal offense, the juvenile was not living at home, that he was

10

employed, that he was not attending school, and appeared to be taking care of himself away from his home.

CP at 23.

Lastly, assuming the sentencing court did not consider Mr. Fisher's mitigating factors of youth, Mr. Fisher has still failed to present any evidence showing the sentencing judge would have imposed a lesser maximum indeterminate sentence had it adequately consider the factors. The record simply reveals the sentencing court ordered a maximum indeterminate sentence of life imprisonment rather than the low end of 20 years.

The trial court abused its discretion when it granted Mr. Fisher's CrR 7.8 motion absent a finding of actual and substantial prejudice.

## CONCLUSION

We reverse the trial court's order that granted Mr. Fisher's CrR 7.8 motion and ordered a full resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

I CONCUR:

_____
Pennell, J.

11

No. 38349-1-III

FEARING, J. (dissent) — The United States Supreme Court decisions in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) and *Montgomery v. Louisiana*, 577 U.S. 190, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016) and the Washington Supreme Court's decision in *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017) brought promise for juvenile offenders to gain liberty. The decisions recognized the foolhardiness of sentencing juveniles as adults, and the rulings directed that youth already sentenced to long terms should have those sentences reviewed and reduced based on factors now known as *Miller* factors. The decisions brought hope to juvenile offenders for a mature life without constant caging accompanied by claustrophobia, physical and sexual deprivation, humiliation from corrections officers, threat of assault, fear of rape, undernourishment, stale food, limited access to healthcare and hygiene, pervasive smell of urine, and odor of disinfectant. That promise of freedom and hope for renewal for juvenile offenders has since become a hoax.

Judges at all levels of the criminal justice system decline to surmount the impulse to severely punish a heinous crime committed by a child. We thereby ignore undisputed neurological science that confirms incomplete development of adolescent brains with the

resultant inability of a youth to understand the consequences of criminal behavior and to fully comprehend the fragility and inherent worth of human life.

Respondent Curtis Fisher committed second degree murder in 1979 at age 17. Fisher remains in prison today. If he, even as an adult, had committed second degree murder on July 1, 1984, rather than on August 17, 1979, his sentence on the high-end standard range would be 14 years, and ten months. He has now served forty-four years, a de facto life sentence, and the State wishes to keep him detained indefinitely, if not for the rest of his life.

If Curtis Fisher had committed aggravated first degree murder, rather than second degree murder, at age 17 in 1979, he would be entitled to a new sentencing hearing before the superior court during which the law would demand the court delete his life imprisonment sentence unless the court found him to be the rare incorrigible and unredeemable youth. Nevertheless, the State refuses Fisher a resentencing hearing before the superior court and instead relegates him to periodic release hearings before the Indeterminate Sentence Review Board (ISRB), chapter 9.95 RCW during which the ISRB imprecisely assesses whether he would likely commit another crime, no matter the gravity of the crime. Something is wrong!

In an unpublished 2018 opinion in *State v. Gilbert*, No. 33794-4-III (Wash. Ct. App. Apr. 3, 2018) (unpublished), https://www.courts.wa.gov/opinions /pdf/337944_unp.pdf, *rev'd*, 193 Wn.2d 169, 438 P.3d 133 (2019), the dissenting judge listed thirty-six tactics employed by innumerable courts to ignore the letter and spirit of

the rulings in *Miller v. Alabama* and *Montgomery v. Louisiana*. Since then, decisions at all levels of the courts have confirmed the accuracy of the dissent's lengthy list and have added other tactics to the list to the end of an ongoing regime of long, indefinite, and life terms for juvenile offenders.

In this appeal by the State of the superior court's grant to Curtis Fisher of a resentencing hearing, the State repeats some of the *Gilbert* dissent's rollcall of wiles fabricated to keep juvenile offenders incarcerated interminably. First, the legislature possesses the sole prerogative of establishing sentences. Second, Curtis Fisher, like many other juvenile offenders, committed a heinous crime. Third, *Miller* does not preclude a life sentence as long as some agency periodically reviews the offender's status. Fourth, de facto life sentences are permissible. Fifth and related to the fourth argument arrayed, no standard exists to determine how long a term-of-years must be before it becomes the equivalent of life imprisonment so the courts need not concern themselves with de facto life sentences. Sixth, the juvenile offender carries the burden of proving transient immaturity rather than the State proving irreparable corruption. Finally, and seventh, no resentencing is needed if the original sentencing court mentions the offender's youth during the sentencing hearing regardless of whether the court weighed the *Miller* factors.

In this appeal, the State adds six tactics to the *Gilbert* dissent's extended catalog of strategies designed to destroy the promise of *Miller*. First, the State insists that a resentencing court cannot apply *Miller* factors to indeterminate sentences. Second, all

arguments forward by Curtis Fisher are procedural in nature and not addressable under the *Miller* factors. Third, the government and, in turn, any court faces difficulty in determining when an offender has been rehabilitated in accordance with the *Miller* factors such that no court should interfere in the government's decision whether to release an offender. Fourth, an ISRB hearing suffices for the *Miller* factors hearing before a superior court even though the ISRB does not evaluate the immaturity of the offender at the time of the crime. Fifth, the offender bears the burden of showing the sentencing court did not consider his youth even if the offender was sentenced during a time that judges never lowered sentences because of the offender's youth. Indeed, Curtis Fisher's judge needed to sentence him as if he was an adult prosecuted in adult court. Finally, and sixth, a challenge to an indeterminate sentence constitutes a challenge to the maximum sentence, which challenge is not subject to cruel punishment clause analysis.

The state of the law has not improved for Curtis Fisher and other juvenile offenders since the *Gilbert* dissent. In addition to new tactics devised by the State of Washington, Washington lower courts, and foreign courts to thwart the promise of *Miller*, the Washington Supreme Court has, since the issuance of *State v. Gilbert*, adopted a befuddling set of rules divorced from reality that preclude juvenile offenders from resentencing hearings. The recent Washington decisions complete the annihilation of the *Miller* promise by erecting a time bar, imposing a sophistic distinction between procedural and substantive challenges, and narrowly viewing prejudice. Atif Rafay,

4

*Evading* Haag*: How Courts Deny That Imprisoning Teens for Life Without Possibility of Parole Is Cruel*, 21 SEATTLE J. FOR SOC. JUST. 731 (2023).

The majority reverses the superior court's wise and humane decision to grant Curtis Fisher a sentencing rehearing that would fulfill the promise made in *Miller v. Alabama* based on the recognition of the vagaries of youth. For three reasons, I dissent from the majority and would either direct that Curtis Fisher presently be released from incarceration or at least affirm the superior court's grant of a resentencing hearing. First, the existence of a lower sentence today, even for adults convicted of second degree murder, renders Fisher's 1979 sentence irrational, surreal, disproportionate, and cruel. Second, the availability of a resentencing hearing before a superior court judge for juveniles convicted of aggravated first degree murder, but the denial of such a hearing to one convicted of second degree murder, leaves Fisher's sentence illogical and cruel, if not violative of the equal protection clause. Third, because the State has never shown Fisher's murder of John Rich, when Fisher was age seventeen, to be other than the result of transient immaturity, Fisher's sentence for forty-four years has reached a de facto lifetime sentence and must end under cruel punishment jurisprudence. The need to map the full mileage to which the State travels to abrogate *Miller v. Alabama*, *Montgomery v. Louisiana*, and *State v. Houston-Sconiers* prolongs this opinion.

### 1979 CRIME AND SENTENCING

Curtis Fisher sits in a Washington Department of Corrections prison as the result of his killing John Rich on August 17, 1979. Curtis Fisher was born February 5, 1962.

He is now 62 years of age.

At age fifteen, Curtis Fisher committed the crimes of second-degree burglary and taking a motor vehicle without permission. By age seventeen, Fisher had left his parents' home and resided on his own.

According to ISRB records, Curtis Fisher and his murder victim, John Rich, suffered a rancorous relationship. Rich had participated in an assault on one of Fisher's friends. Rich owed Fisher money for the purchase of narcotics.

On August 17, 1979, Curtis Fisher, age 17, and two accomplices retrieved John Rich. When Rich entered the vehicle, he carried a gun. The foursome attempted to locate an individual trafficking drugs. When they were unable to locate the seller, the four proceeded to the Yakima River. Rich, Fisher, and another of the quartet exited the vehicle. Fisher and the other gained possession of Rich's gun and demanded that Rich kneel on the ground. Fisher shot Rich in the side of the chest. Rich arose and ran from Fisher. Fisher and his colleague followed Rich, and Fisher fired additional shots. One bullet felled Rich at the river's edge. He died. According to Fisher, he and his friends had smoked marijuana and the killing resulted from a "drug deal gone wrong." Br. of Resp't at 3.

On August 14, 1979, the State of Washington charged Curtis Fisher with first degree murder, under RCW 9A.32.030(1)(a), a class A felony. The State filed the charge in superior court, without mentioning the juvenility of Fisher. The State alleged that Fisher shot and killed, with premeditated intent to cause death, John Rich.

6

In 1979, a first degree murder charge carried a mandatory life sentence. Former RCW 9A.32.040(3)(1977). Depending on the presence of aggravating circumstances and the lack of mitigating circumstances, the offender could also receive the death sentence or life without the opportunity of parole. Former RCW 9A.32.040(3)(1977).

On August 31, 1979, Yakima County Superior Court Judge Bruce Hanson declined juvenile court jurisdiction. Judge Hanson found as part of the order of declination:

> That the juvenile [Curtis Fisher] appears to be mature for his age at times while at other times he appears to be immature. That the juvenile appears to behave in a mature manner when with adults and to behave in an immature manner when with younger people. That immediately prior to the commission of the alleged criminal offense, the juvenile was not living at home, that he was employed, that he was not attending school, and appeared to be taking care of himself away from his home.

Clerk's Papers (CP) at 23.

On September 18, 1979, the State of Washington amended the information to charge second degree murder. In turn, Curtis Fisher pled guilty to second degree murder. In his signed statement on plea of guilty, Fisher conceded that he, with intent to kill, shot John Rich and Rich later expired. In the plea, Fisher recognized that the State would seek a life imprisonment sentence. He further acknowledged that the superior court would assess a twenty-year to life sentence.

In 1979, Washington state employed indeterminate sentencing. Chapter. 9.95 RCW. Under indeterminate sentencing, the trial court sentenced an offender to a maximum amount of time. In turn, the predecessor to the ISRB, the Board of Prison

7

Terms and Paroles (Board), established the minimum term and governed the amount of time the offender would actually serve. The Board possessed the authority to decide when to release the offender from incarceration. In 1979, the superior court could sentence an offender committing second degree murder to a maximum of anywhere between twenty years to life. RCW 9.95.010; former RCW 9A.32.050.

On September 18, 1979, Yakima County Superior Court Judge Bruce Hanson entered a judgment and sentence that committed and remanded Curtis Fisher to the Department of Social and Health Services, Division of Institutions, the predecessor of DOC, for a period not to exceed life imprisonment. The court did not impose a minimum term. On December 11, 1979, the Board fixed Curtis Fisher's minimum term at thirteen years.

## INCARCERATION

As a teenager and young adult in Washington's penal system, Curtis Fisher incurred many prison infractions, including serious infractions, each year. The number of infractions has decreased with time such that, since 2016, Fisher has incurred two or less infractions each year.

After a parolability hearing in 1988, the Board of Prison Terms and Paroles, pursuant to RCW 9.95.100, denied Curtis Fisher parole. The law brands such hearings ".100 hearings." The Board instead extended Fisher's minimum sentence five years. The Board described the murder of John Rich as being in "cold blood." CP at 9. According to the Board, Fisher earned a "horrendous" "institutional infraction record." CP at 9.

8

Statistics show that nearly all youth in DOC incarceration accumulate horrendous infraction records until a time between the ages of 25 and 30. As the ISRB explained to the Washington State Senate regarding offenders subject to release under the *Miller* fix;

> In terms of the trauma that's imposed from their being imprisoned from a very young age…, it's very common for the first five to ten years for them to have horrific behavior in prison, a lot of infractions, fighting, STG [Security Threat Group] or gang-related affiliations, because they're trying to survive and they're literally fighting sometimes for their lives.

Hr'g on S.B. 5164. Before the S. Human Services, Reentry & Rehabilitation Comm., 66th Leg., Reg. Sess. (Wash. Jan. 24, 2019), at 86 min., 33 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

At the time of the hearing, Fisher sat in administrative segregation due to confidential information that he possessed a weapon, with which he intended to stab another inmate. Fisher denied the allegation, and the Board admitted that correction officials failed to prove the allegation.

During later years, the Board of Prison Terms and Paroles and later the Board's successor agency, the ISRB, periodically and repeatedly denied Curtis Fisher parole. After a .100 hearing in 2019, the ISRB wrote that Fisher had garnered 228 infractions during his tenure. Since Fisher had been in prison for forty years by then, one may wonder if 228 infractions are high for this length of time. The ISRB concluded that Fisher constituted a 58 percent risk of reoffending within five years if released and a 78 percent risk within twelve years. The report stated that, in 2014 and 2015, Fisher served

as the prison banker for the sale of drugs to other prisoners by the Aryan Family. In 2019, a urinalysis tested positive for cannabis, opiates, and methamphetamine.

Some of the DOC records concerning Curtis Fisher are Aramaic to a layperson because of the acronyms and argot employed. Review notes from May 10, 2021 read that Fisher is employed as a custodian. He was not able to complete some objectives because of a postponement of offender programming. I do not know if this postponement is the result of the COVID pandemic.

A February 9, 2020 letter from Curtis Fisher to the ISRB claimed that he was infraction free. Fisher asserted that the Board had in the past deemed him conditionally parolable. He asked the Board to identify and enlist him in any program needed to gain parole.

On October 19, 2021, the ISRB conducted another .100 hearing. On December 21, 2021, the ISRB issued its decision, which again denied Curtis Fisher parole. The ISRB wrote that Fisher was likely to commit a new criminal law violation if released on conditions. The ISRB based its decision in part on Fisher's failure to complete substance abuse treatment. One witness indicated, however, that Fisher had begun to attend substance abuse treatment, but ended his participation because of a hearing impairment. Dr. Lisa Robtoy, after analyzing risk assessment tools, concluded that Fisher was a moderate to high risk for violent recidivism. According to the ISRB, Fisher lacked adequate community support. Fisher's last serious prison infraction occurred in 2019 and his last minor infraction occurred in 2017.

10

CrR 7.8 MOTION

In November 2020, Curtis Fisher filed a CrR 7.8 motion before the superior court to vacate his judgment and sentence. Despite the pleading stating Fisher wanted the superior court to vacate his judgment, Fisher effectively asked for his prison sentence to end. The motion emphasized Fisher's age of 17 at the time of the commission of his crime. Fisher argued that the 1979 sentencing court failed to consider his immaturity at the time of the crime and the time of his sentence. Fisher asked to be sentenced under the rules announced by the Washington Supreme Court in *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017).

Washington treats CrR 7.8 motions the same as personal restraint petitions. *State v. Larry*, 28 Wn. App. 2d 678, 685, 538 P.3d 297 (2023). In this opinion, I apply personal restraint petition rules to Fisher's CrR 7.8 motion. I will often refer to Fisher's motion as a petition.

In his CrR 7.8 motion, Curtis Fisher asserted that the one-year time bar, found in RCW 10.73.090(1) and controlling personal restraint petitions, did not preclude his motion because of a change in law. According to Fisher, under *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 474 P.3d 524 (2020) and *In re Personal Restraint of Ali*, 196 Wn.2d 220, 474 P.3d 507 (2020), both decided by the Washington Supreme Court on September 17, 2020, the rules, announced in *State v. Houston-Sconiers* apply retroactively to juvenile sentencing. Those rules demand his resentencing before a

11

superior court, during which resentencing the court must find him incorrigible at the time of the crime or else the DOC must release him from prison.

Against the State of Washington's objection, the superior court granted Curtis Fisher's request for resentencing. The court found that the 1979 superior court failed to consider Fisher's age and the mitigating qualities of youth. Resentencing has never occurred because of this appeal by the State. The court has yet to assess whether it should reduce Fisher's sentence. Fisher remains behind bars.

After the State appealed the superior court's decision, Curtis Fisher, pursuant to a Washington *Miller* fix statute, RCW 9.94A.730, sought release. Supplemental report filed April 14, 2022. The ISRB denied the request.

In July 2023, the ISRB held another .100 hearing. The ISRB again denied release. By that date, Curtis Fisher had completed substance use disorder treatment. He also completed stress and anger management treatment among other courses. The ISRB statistics showed Fisher's recidivism risk had decreased to "a moderate risk for future violence, low moderate risk for causing serious physical harm, and low risk for imminent violence." Appellant's Reply Br., Appendix A at 5. He had recently committed an infraction because of physical contact with another inmate. The ISRB's July 2023 decision does not state that Fisher will likely commit a crime if released.

CRUEL PUNISHMENT

Curtis Fisher bases his motion for relief from incarceration on the constitutional theory of cruel punishment. Under the United States Constitution's Amendment Eight:

> Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*.

(Emphasis added.) The Eighth Amendment applies to the states by application of the due process clause of the Fourteenth Amendment to the United States Constitution. *Robinson v. California*, 370 U.S. 660, 675, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962).

The Washington Constitution's analog, article I, section 14, declares:

> Excessive bail shall not be required, excessive fines imposed, *nor cruel punishment inflicted*.

(Emphasis added.) Section 14 purposely omitted the word "unusual" from the punishment clause. *State v. Fain*, 94 Wn.2d 387, 393, 617 P.2d 720 (1980). Under the federal constitution, the punishment could be cruel, but not unusual, and avoid scrutiny. Washington's article I, section 14 sometimes affords greater protection for the offender than the Eighth Amendment. *State v. Bassett*, 192 Wn.2d 67, 78-79, 428 P.3d 343 (2018).

The Eighth Amendment and, in turn, article I section 14 bar not only barbaric punishments but also punishments disproportionate to the crime committed. *Coker v. Georgia*, 433 U.S. 584, 591-92, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977); *In re Personal Restraint of Hinton*, 1 Wn.3d 317, 326, 525 P.3d 156 (2023). The law has expanded the proportionality doctrine beyond its origins with the death penalty to noncapital cases to help courts decide whether sentences of ordinary imprisonment are commensurate with the crimes for which such sentences are imposed. *State v. Fain*, 94 Wn.2d 387, 396 (1980). Courts view the notion of proportionality less through a historical prism than

13

according to the evolving standards of decency that mark the progress of a maturing society. *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *State v. Fain*, 94 Wn.2d 387, 397 (1980). Inappropriate disparity in sentencing results in justified bitterness and lack of respect for the law by persons who have been the recipients of unequal sentences. *State v. Hurst*, 5 Wn. App. 146, 149, 486 P.2d 1136 (1971).

Only punishment grossly disproportionate to the gravity of the offense violates the state and federal constitutional guarantee. *State v. Bowen*, 51 Wn. App. 42, 47, 751 P.2d 1226 (1988). To be "grossly disproportionate" punishment must shock the general conscience and violate principles of fairness. *State v. Smith*, 93 Wn.2d 329, 344-45, 610 P.2d 869 (1980); *State v. LaRoque*, 16 Wn. App. 808, 810, 560 P.2d 1149 (1977).

A defendant may challenge the proportionality of his sentence in two different ways under both the Eighth Amendment and Washington article I, section 14. *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *State v. Moen*, 4 Wn. App. 2d 589, 598, 422 P.3d 930 (2018). Curtis Fisher implicitly relies on both forms of challenges.

Under the first method of employing cruel punishment jurisprudence, a defendant may assert a categorical challenge by arguing that an entire class of sentences is disproportionate based on the nature of the offense or the characteristics of a class of offenders. *Graham v. Florida*, 130 S. Ct. 2011, 2022 (2010). This categorical bar analysis first reviews any objective indicia of a national consensus against the sentencing

14

practice at issue. *State v. Bassett*, 192 Wn.2d 67, 83 (2018). The analysis then employs the court's own independent judgment based on the standards elaborated by controlling precedents and by the court's own understanding and interpretation of the cruel punishment provision's text, history, and purpose. *State v. Bassett*, 192 Wn.2d 67, 83 (2018). The categorical approach requires consideration of the culpability of the offender in light of his crimes and characteristics, the severity of the punishment in question, and the punishment's relationship to legitimate penological goals. *Graham v. Florida*, 560 U.S. 48, 67 (2010); *State v. Reynolds*, 2 Wn.3d 195, 207, 535 P.3d 427 (2023).

The second method of challenging the length of a sentence is to argue the sentence is grossly disproportionate given the offender's circumstances. *State v. Moen*, 4 Wn. App. 2d 589, 598 (2018). Courts refer to this second variety of challenge as an "as-applied" challenge. *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014).

When responding to an as-applied challenge to the length of the sentence, the Washington Supreme Court employs the *Fain* test or factors announced in *State v. Fain*, 94 Wn.2d 387 (1980). *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014); *State v. Bassett*, 192 Wn.2d 67, 73 (2018). The *Fain* proportionality test considers (1) the gravity of the offense and the harshness of the penalty, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction. *State v. Fain*, 94 Wn.2d 387, 396 (1980). These are only factors to consider, and no one factor is dispositive. *State v. Gimarelli*, 105 Wn. App. 370, 380-81,

15

20 P.3d 430 (2001). The *Fain* factors enhance the proposition that "a punishment clearly permissible for some crimes may be unconstitutionally disproportionate for others." *State v. Fain*, 94 Wn.2d 387, 397 (1980).

The first step of the *Fain* proportionality test focuses on the harm caused and the culpability of the offender. *Solem v. Helm*, 463 U.S. 277, 292, 103 S. Ct. 3001, 77 L.Ed.2d 637 (1983). As to the fourth step, the court compares the sentence to sentences given for related crimes such as different degrees of the same crime. *State v. Gonzalez*, 326 Or. App. 587, 534 P.3d 289, 295 (2023), *review granted*, No. S070433 (Or. Dec. 7, 2023). The carrying of a less severe sentence by a more serious crime indicates disproportionality, particularly when considering the penalties imposed for other crimes that have similar characteristics to the crime at issue. *State v. Lara-Vasquez*, 310 Or. App. 99, 108, 484 P.3d 369 (2021).

The *Fain* test may be inherently difficult to apply. *State v. Fain*, 94 Wn.2d 387, 396 (1980). Nevertheless, the challenges posed by the application of the test do not warrant rejecting it. *State v. Gonzalez*, 534 P.3d 289, 292 (2023).

## YOUTHFULNESS

In 1979, the year of seventeen-year-old Curtis Fisher's sentencing, and for decades thereafter, American jurisprudence treated teenage murderers the same as adult murderers. Juvenile courts rotely declined jurisdiction over a teenager accused of murder, and the adult courts prosecuted and sentenced teenagers as if adults. A fifteen-

16

year-old, who committed a crime, was deemed as blameworthy as a fifty-year-old, who committed the same crime. *In re Boot*, 130 Wn.2d 553, 569-70, 925 P.2d 964 (1996).

Beginning in 2005, the United States Supreme Court acknowledged advances in neurological science. The United States Supreme Court thereafter issued landmark decisions, under the Eighth Amendment's cruel and unusual punishment clause, concerning juvenile offender sentencing. *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48(2010); *Miller v. Alabama*, 567 U.S. 460 (2012); and *Montgomery v. Louisiana*, 577 U.S. 190, (2016).

According to the United States Supreme Court, the cruel and unusual punishment clause demands that the penal system treat offenders under the age of eighteen differently. Children's lack of maturity and underdeveloped sense of responsibility lead to recklessness, impulsivity, and heedless risk taking. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Children are more vulnerable to negative influence and outside pressure from family and peers, have limited control over their environments, and lack the ability to extricate themselves from horrific, crime-producing settings. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Adolescent brains are not yet fully mature in regions and systems related to higher order executive functions such as impulse control, planning, and risk avoidance. *Miller v. Alabama*, 567 U.S. 460, 475 n.5 (2012). All of these features impact a tendency to commit a crime. *Miller v. Alabama*, 567 U.S. 460, 473 (2012). Commonsense, parental knowledge, physical science, and social science confirm these observations. *Miller v. Alabama*, 567 U.S. 460, 472 n.5 (2012). Because a child's

17

character is not as well formed as an adult's, the child's traits are less fixed, and his actions are less likely to be evidence of depravity. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. *Roper v. Simmons*, 543 U.S. 551, 570 (2005).

According to the United States Supreme Court, the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. *Miller v. Alabama*, 567 U.S. 460, 472 (2012). Deterrence supplies a flawed rationale for punishment because of juveniles' impulsivity and inability to consider the consequences of their actions. *Miller v. Alabama*, 567 U.S. 460, 472 (2012). Retribution's focus on blameworthiness also does not justify a lengthy sentence because juveniles have severely diminished moral culpability. *Miller v. Alabama*, 567 U.S. 460, 472 (2012). Incapacitation fails to justify a long sentence because adolescent development diminishes the likelihood that an offender forever will be a danger to society. *Miller v. Alabama*, 567 U.S. 460, 472-73 (2012).

With a new understanding of juvenile brain development, the United States Supreme Court established strictures on harsh and long sentences for teenagers, even youth committing murder. The Eighth Amendment's cruel and unusual punishment clause compelled these sentencing restrictions.

Because of the constitutional nature of children, including teenagers, the United States Supreme Court, in *Miller v. Alabama*, 567 U.S. 460 (2012), mandated that a

sentencer follow a process that incorporates consideration of the offender's chronological age and its hallmark features and other mitigating features before imposing life without parole. The attended characteristics include: chronological age, immaturity, impetuosity, failure to appreciate risks and consequences, the surrounding family and home environment, the circumstances of the offense, including the extent of the offender's participation in the offense and any pressures from friends or family affecting him, the inability to deal with police officers and prosecutors, incapacity to assist an attorney in his or her defense, and the possibility of rehabilitation. *Miller v. Alabama*, 567 U.S. 460, 477-78 (2012). Courts now call these characteristics "the *Miller* factors."

In *Miller v. Alabama*, the Court struck down state laws mandating life without parole sentences for juveniles found guilty of even aggravated first degree murder. The Court strongly inferred, if not held, that no juvenile could receive a lifetime sentence for any crime unless the sentencing court finds the juvenile to be a "rare juvenile offender whose crime reflects irreparable corruption." *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012). The Court noted that the appropriate occasion for sentencing a juvenile homicide offender to life without parole will be "uncommon." *Miller v. Alabama*, 567 U.S. 460, 479 (2012). Life without parole is constitutional only for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, 577 U.S. 190, 209 (2016). Conversely, the Eighth Amendment mandates parole eligibility for juvenile murderers whose crimes reflect only transient immaturity. The opportunity for release will be afforded to those who demonstrate the truth of

19

*Miller*'s central intuition that children who commit even heinous crimes are capable of change.

In *Montgomery v. Louisiana*, 577 U.S. 190 (2016), the high Court readdressed the subject of life without parole sentences for juvenile homicide offenders. *Montgomery* held that *Miller* applied retroactively to offenders who were juveniles when they committed their crimes. Against contentions that the *Miller* ruling only imposed a procedure for resentencing, the Court announced that *Miller* established a substantive rule that juveniles, whose crimes reflect "only transient immaturity" and who have since matured, will not be forced to serve a life without parole sentence. *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016). Under the cruel and unusual punishment clause, sentencing courts must exercise their discretion at the time of sentencing itself with regard to the youth of the offender, regardless of what opportunities for discretionary release may occur in the future. *Miller v. Alabama*, 567 U.S. 460, 477-83 (2012); *State v. Houston-Sconiers*, 188 Wn.2d 1, 20 (2017).

In *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), our Supreme Court addressed *Miller v. Alabama*'s applicability to juvenile defendants who received lengthy mandatory sentences for crimes other than homicide. The Evergreen high court held that the Eighth Amendment and *Miller* require that sentencing courts possess absolute discretion to depart as far as desired below the otherwise applicable Sentencing Reform Act of 1981 (SRA), ch. 9.94 RCW, ranges when sentencing juveniles in adult court. Sentencing courts also may exercise the prerogative to reduce or ignore sentencing

enhancements. To the extent Washington sentencing statutes had been interpreted to bar

such discretion with regard to juveniles, the high court deemed the statutes

unconstitutional.

The requisite sentencing hearing for a juvenile in adult court, under Washington

jurisprudence, is no longer an ordinary sentencing proceeding. *State v. Ramos*, 187

Wn.2d 420, 443, 387 P.3d 650 (2017). *Miller v. Alabama* establishes an affirmative

requirement that courts fully explore the impact of the defendant's juvenility on the

sentence rendered. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). A court must do more

than simply recite the differences between juveniles and adults and do more than render

conclusory statements that the offender has not justified an exceptional downward

sentence. *State v. Ramos*, 187 Wn.2d 429, 443 (2017). The sentencing court must

thoroughly explain its reasoning, specifically considering the differences between

juveniles and adults identified by the *Miller* Court and how those differences apply to the

case presented. *State v. Ramos*, 187 Wn.2d 443, 444 (2017).

In addition to the Washington Supreme Court taking action in response to the

*Miller v. Alabama*, the state legislature, in 2014, enacted changes to juvenile sentencing

statutes. Washington courts denominate the statute as the *Miller*-fix statute. LAWS OF

2014, ch. 130. The statute now lies in three discrete sections in the Washington code:

RCW 9.94A.730, RCW 10.95.030, and RCW 10.95.035. All three provisions loom

critical in this appeal.

In 2014, former RCW 10.95.030 (3)(a)(ii) declared:

21

Any person convicted of the crime of aggravated first degree murder for an offense committed when the person is at least sixteen years old but less than eighteen years old shall be sentenced to a maximum term of life imprisonment and a minimum term of total confinement of no less than twenty-five years. *A minimum term of life may be imposed, in which case the person will be ineligible for parole or early release.*

(b) In setting a minimum term, the court must take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller v. Alabama*, 132 S. Ct. 2455 (2012) including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.

(Some emphasis added.). Note that the statute still allowed the superior court to impose a life without the opportunity of parole sentence as long as the court considered the *Miller* factors.

The 2014 *Miller*-fix legislation also designated a resentencing process for juvenile offenders convicted of aggravated first degree murder and sentenced, before June 1, 2014, to mandatory terms of life without the possibility of parole. LAWS OF 2014, ch. 130. As a result of the legislation, former RCW 10.95.035 2014 declared in part:

(1) A person, who was sentenced prior to June 1, 2014, under this chapter or any prior law, to a term of life without the possibility of parole for an offense committed prior to their eighteenth birthday, shall be returned to the sentencing court or the sentencing court's successor for sentencing consistent with RCW 10.95.030. Release and supervision of a person who receives a minimum term of less than life will be governed by RCW 10.95.030.

Note that the resentencing occurs before the superior court, not the ISRB, and the superior court must consider the *Miller* factors when resentencing. This opportunity for

22

resentencing before the superior court under the *Miller* factors does not extend to those convicted of lesser crimes such as second degree murder.

The final section of the *Miller*-fix statute, RCW 9.94A.730, includes a provision authorizing juvenile offenders imprisoned from crimes other than aggravated first degree murder to petition the ISRB for early release after serving at least twenty years of confinement. The statute reads:

> (1) Notwithstanding any other provision of this chapter, any person convicted of one or more crimes committed prior to the person's eighteenth birthday may petition the indeterminate sentence review board for early release after serving no less than twenty years of total confinement, provided the person has not been convicted for any crime committed subsequent to the person's eighteenth birthday, [and] the person has not committed a disqualifying serious infraction as defined by the department in the twelve months prior to filing the petition for early release . . .
> . . . .
> (3) No later than one hundred eighty days from receipt of the petition for early release, the department shall conduct, and the offender shall participate in, an examination of the person, incorporating methodologies that are recognized by experts in the prediction of dangerousness, and including a prediction of the probability that the person will engage in future criminal behavior if released on conditions to be set by the board. . . . The board shall order the person released under such affirmative and other conditions as the board determines appropriate, unless the board determines by a preponderance of the evidence that, despite such conditions, *it is more likely than not that the person will commit new criminal law violations if released.* The board shall *give public safety considerations the highest priority when making all discretionary decisions regarding the ability for release and conditions of release.*
> . . . .
> (6) An offender whose petition for release is denied may file a new petition for release five years from the date of denial or at an earlier date as may be set by the board.

23

If the ISRB grants release, the offender remains subject to supervision by DOC, under community custody, for a period of time determined by the Board. RCW 9.94A.730(5).

A hearing before the ISRB under RCW 9.94A.730 is not a resentencing. *In re Personal Restraint of Brooks*, 197 Wn.2d 94, 102, 480 P.3d 399 (2021). Instead, an early release hearing under the statute looks to the future and focuses on one's likelihood of reoffending. *In re Personal Restraint of Brooks*, 197 Wn.2d 94, 102 (2021). *Miller* and *Montgomery* demand resentencing wherein the resentencing court determines whether the juvenile offender was incorrigible at the time of the original sentencing. Unlike RCW 9.94A.730, RCW 10.95.030 and .035 demand that the resentencing court seriously contemplate and apply the *Miller* factors.

To repeat, RCW 10.95.030 initially allowed the resentencing court to commit a juvenile offender to life without the opportunity of parole after considering the *Miller* factors. In *State v. Bassett*, 192 Wn.2d 67, 73 (2018), the Washington Supreme Court held that sentencing juvenile offenders to life without parole or early release, even if discretionary rather than mandatory, constitutes cruel punishment and therefore is unconstitutional under article I, section 14 of the Washington Constitution. In turn, the Washington Supreme Court declared unconstitutional that portion of RCW 10.95.030 that permitted the imposition of life imprisonment without parole. *State v. Bassett*, 192 Wn.2d 67, 73 (2018).

In 1995, when Brian Basset was sixteen years old, he lived in a shack with a friend after Bassett's parents expelled him from home. With assistance from his friend, Bassett

returned home, shot and killed his mother and father, and drowned his brother in a

bathtub.  The superior court convicted Bassett of three counts of aggravated first degree

murder.  The superior court deemed Bassett a walking advertisement for the death

penalty, but sentenced him to three consecutive terms of life in prison without parole.

In 2015, Brian Bassett returned to superior court for the resentencing, under

RCW 10.95.030 and .035, required for those convicted of aggravated first degree murder.

The superior court again sentenced him to three consecutive life without parole

sentences.  The Court of Appeals adjudged the sentence in RCW 10.95.030 permitting a

life sentence without parole unconstitutional.  The Supreme Court accepted review.

On appeal, Brian Bassett argued that RCW 10.95.030(3), one section of the

*Miller*-fix statute, was unconstitutional under Washington's cruel punishment clause

because it permitted life sentences for juveniles convicted of aggravated first degree

murder.  The Washington Supreme Court faced the initial question of whether to apply a

grossly disproportionate sentence analysis or a categorical bar analysis.  In the end it did

not matter, since the court declared RCW 10.95.030(3) unconstitutional under either

approach.  Nevertheless, the court deemed the categorical bar analysis more suitable.

The Supreme Court, in *Bassett*, observed that the *Fain* disproportionality

framework focuses away from the characteristics of the offender class.  The *Fain* test

instead weighs the offense with the punishment.  Thus, the *Fain* framework

uncomfortably analyzes a claim of cruel punishment based on the offender class of youth.

The categorical bar analysis, on the other hand, directs a court to consider the nature of

25

children. The categorical approach requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question and whether the sentence serves legitimate penological goals. Issues of culpability, the severity of the punishment, and whether penological goals are served all allow the court to include youth-specific reasoning into the analysis. When addressing punishment of children, the court generally does not focus on the severity of the crime.

The Washington Supreme Court, in *State v. Bassett*, applied the categorical bar analysis and found RCW 10.95.030 constitutionally wanting. The court agreed with Brian Bassett that the direction of change in the United States unmistakably and steadily moves toward abandoning the practice of putting child offenders in prison for their entire lives. This observation did not control but weighed in favor of finding that sentencing juvenile offenders to life without parole is cruel punishment under article I, section 14. RCW 10.95.030, a portion of the *Miller*-fix statute, allowed children to be sentenced to the extremely severe punishment of life without parole.

The Washington Supreme Court adopted the United States Supreme Court's characterization in *Graham v. Florida* of permitting a juvenile to die in prison as harsh. Life without parole alters the offender's life with an irrevocable forfeiture and deprives individuals of the most basic liberties without giving hope of restoration. The sentence is especially harsh for children, who will on average serve more years and a greater percentage of their lives in prison than an adult offender. The juvenile should not be

26

deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential.

The Washington Supreme Court, in *State v. Bassett*, reflected that a life sentence does not serve the penological goals of retribution, deterrence, incapacitation, or rehabilitation in the context of youth committing even heinous crimes. The distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders. The heart of retribution relates to an offender's blameworthiness, and children have diminished culpability. Deterrence lacks effect in this context, because the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—render them less likely to consider potential punishment. Rehabilitation is not supported by a juvenile life sentence because the sentence forswears altogether the rehabilitative ideal. Incapacitation is not well served by sentencing juveniles to life without parole because deciding that a juvenile offender forever will be a danger to society would require a judgment that he is incorrigible, but incorrigibility is inconsistent with youth. The penological goal of incapacitation is especially concerning given the fact that the sentence makes an irrevocable judgment about that person at odds with what we know about children's capacity for change.

The Washington Supreme Court, in *State v. Bassett*, while recognizing that, under United States Supreme Court precedent, only the rarest of children who are incorrigible can spend life in prison, discerning who is subject to this extreme punishment is arduous,

27

if not unfeasible. While RCW 10.95.030(3)(b) required sentencing courts to consider youth's chances of becoming rehabilitated, courts face extreme difficulty in making that determination. Even expert psychologists confront impossibility when differentiating between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. Although the Supreme Court did not declare such, this observation should render any life sentence, regardless of availability of release, unconstitutional. A judge can only issue imprecise and subjective judgments regarding transient immaturity and irreparable corruption. The same factor that one sentencing judge might consider material in releasing the juvenile offender could lead another judge to consider the offender incorrigible and unrehabilitated and not amenable to release.

The *Bassett* court noted that Brian Bassett's sentencing court concluded that Bassett's living apart from his parents evidenced his maturity. Another judge, however, could deem the homelessness as evidence of instability and insecurity thereby leaving Bassett less able to control his emotions and actions. Because of the whims that can motivate the sentencing court's decision and the discretion afforded the court when rendering a decision, the difference between living the rest of one's life in prison or having a chance to return to society becomes too great of a risk to leave to a court, let alone expert children's psychologists.

The Washington Supreme Court, in *State v. Bassett*, observed that, even if it applied the *Fain* proportionality test, it would still find that sentencing a juvenile offender

28

to life without parole violated article I, section 14.  Undoubtedly, aggravated first degree

murder formed the most serious criminal offense.  The legislature, in RCW 10.95.030,

announced the purpose of requiring sentencing courts to "take into account mitigating

factors that account for the diminished culpability of youth as provided in *Miller*."  LAWS

OF 2014, ch. 130, § 9(3)(b).  Thus, the first two factors warranted a serious punishment

for aggravated murder.  The third factor, the punishment juveniles would receive in other

jurisdictions, weighed in favor of finding juvenile life without parole sentences cruel

punishment and unconstitutional.  Lastly, the fourth factor directed the court to look at

the punishment juveniles would receive for other offenses in the same jurisdiction.

Juveniles in Washington could be sentenced to life without parole only if convicted of

aggravated first degree murder.  RCW 10.95.030.  If a juvenile was convicted of any

other crime or combination of crimes, he or she would be eligible for release after 20

years, unless he or she has committed a disqualifying infraction in the prior year.  RCW

9.94A.730(1).  The punishment was extreme in comparison to the sentence Washington

would impose for other crimes.  Thus, life without parole was a disproportionate sentence

for juvenile offenders rendering RCW 10.95.030(3)(a)(ii) unconstitutional under article I,

section 14.  The court remanded sentencing back to the superior court for resentencing in

light of Bassett's immaturity at the time of his murders.

Under the categorical bar analysis adopted in *State v. Bassett*, Curtis Fisher's

sentence must end.  The same factors and reasoning that preclude a life without parole

sentence and invalidated one provision in RCW 10.95.030 demands the release of Fisher.

Fisher has reached age 62. His sentence, now forty-four years and persisting, has matured into a life sentence. Nothing in *State v. Bassett* restricts its holding to *statutorily* mandatory life without parole sentences. *State v. Anderson*, 200 Wn.2d 266, 296, 516 P.3d 1213 (2022) (Gonzalez, C.J., dissenting). *Bassett* held that, under article I, section 14 of our constitution, any life-without-parole sentence for a juvenile offender is unconstitutional. *State v. Anderson*, 200 Wn.2d 266, 296 (2022) (Gonzalez, C.J., dissenting). The decision's reasoning extends to any life spent in prison by a juvenile offender regardless of whether the sentence results from a mandatory sentence or a never-ending indeterminate sentence. *State v. Bassett* created no exception to the prohibition on a life sentence for those unrehabilitated. The nature of a life sentence for a juvenile remains cruel no matter the type or characteristics of the sentence imposed and no matter if the offender remains unremorseful, difficult, troubled, and naughty. A life sentence remains cruel regardless if the offender enjoys the opportunity for parole if he obeys prison staff.

As hinted in the previous paragraph, by demanding that Curtis Fisher gain parole acceptance from the ISRB, the State in essence imposes a de facto life sentence on Fisher. In *Sam v. State*, 2017 Wy 98, 401 P.3d 834, 842 (Wyo. 2017), the Wyoming high court ruled that a sentence imposed on Phillip Sam of a minimum fifty-two years with possible release at age seventy constituted a de facto life sentence. In *Bear Cloud v. State*, 2014 WY 113, 334 P.3d 132, 136 (WYO. 2014), the same western court adjudged a sentence of a minimum of forty-five years, with possible release at age sixty-one, as the

functional equivalent of life without parole. In *State v. Williams-Bey*, 167 Conn. App. 744, 144 A.3d 467 (2016), the court remanded for a new hearing a sentence that would not release a juvenile offender convicted of murder until age fifty-two.

Most courts that have considered the issue agree that a lengthy term of years for a juvenile offender will become a de facto life sentence at some point. *Casiano v. Commissioner of Corrections*, 317 Conn. 52, 115 A.3d 1031, 1044 (2015). The United States Supreme Court viewed the concept of "life" in *Miller* and *Graham* more broadly than biological survival and implicitly endorsed the notion that an individual is effectively incarcerated for life if he will have no opportunity to truly reenter society or have any meaningful life outside of prison. *Casiano v. Commissioner of Corrections*, 115 A.3d 1031, 1047 (2015). The Supreme Court's *Miller* decision intended to allow juvenile offenders the opportunity to live a part of their lives in society, not simply to leave prison in order to die. *State v. Moore*, 149 Ohio St. 3d 557, 2016-Ohio-8288, 76 N.E.3d 1127, 1137 (2016).

Washington follows the majority view. In *State v. Ramos*, 187 Wn.2d 420 (2017), our high court wrote:

> [Similarly,] we also reject the notion that *Miller* applies only to literal, not de facto, life-without-parole sentences. Holding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crimes and the individual's culpability before sentencing a juvenile homicide offender to die in prison, in direct contradiction to *Miller*. Whether that sentence is for a single crime or an aggregated sentence for multiple crimes, we cannot ignore that the practical result is the same.

*State v. Ramos*, 187 Wn.2d 420, 438-39 (2017). Also, *Bassett* held that, under article I, section 14 of our constitution, any life-without-parole sentence for a juvenile offender is unconstitutional even if by a de facto imposition. *State v. Anderson*, 200 Wn.2d 266, 296 (2022) (Gonzalez, C.J., dissenting).

Two Washington decisions compel a release of Curtis Fisher from incarceration because of his decades in prison. In *State v. Ronquillo*, 190 Wn. App. 765, 361 P.3d 779 (2015), this court deemed a 51.3-year sentence for murder and other violent, gang-motivated crimes as a de facto life sentence. The sentence contemplated Ronquillo remaining incarcerated until the age of 68. This court deemed the de facto life sentence to have impermissibly categorized Ronquillo as irredeemable, a characterization inconsistent with *Miller v. Alabama*. Before a court can sentence a youth offender to a functional equivalent of a life sentence, the court must consider how children are different and assess whether the offender was irrevocably corrupt. This court remanded to the superior court to resentence Brian Ronquillo, who committed the crimes at age sixteen.

The most compelling decision in the context of Curtis Fisher's petition is *State v. Haag*, 198 Wn.2d 309, 495 P.3d 421 (2021). Timothy Haag experienced a troubled upbringing. In 1994, Haag, at age 17, killed a seven-year-old neighbor girl. A jury convicted Haag of first degree aggravated murder. The superior court then sentenced him to mandatory life without parole. During more than two decades in prison, Haag showed tremendous growth and maturity. An expert concluded that Haag was a low risk for

reoffending. In 2018, the superior court resentenced Haag under the *Miller*-fix provisions of RCW 10.95.030 and .035. After the hearing, the resentencing court found that Haag is not irretrievably depraved or irreparably corrupt. Nevertheless, after hearing from the victim's family of the need to keep a child killer behind bars and that such a man is incapable of reform, the superior court resentenced Haag to forty-six years to life. The resentencing court mentioned that Haag, weighing three hundred pounds at the time of the homicide, strangled a sixty-five-pound defenseless child during a heinous multi-step strangulation. With the resentence, the earliest release date for Haag was age 63.

On appeal to the Supreme Court, the court reversed Timothy Haag's resentencing because the superior court emphasized retribution over mitigation. RCW 10.95.030 demands that the sentencing court place greater emphasis on mitigation factors than on retributive factors. The court repeated the presumption that youth possess diminished culpability. Only the rare offender is irreparably corrupt. The court also characterized the first possible release date of age 63 as comprising a de facto life sentence. A minimum sentence of forty-six years also constituted a de facto life sentence. Article 1, section 14 and *Miller* applies to juvenile homicide offenders facing de facto life sentence not just literal life without the opportunity of parole sentences. The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a meaningful opportunity to demonstrate the maturity and rehabilitation required to obtain release and reenter society as required by *Graham v. Florida*.

33

Curtis Fisher's case differs from Timothy Haag's case because Fisher has failed to show the growth that Haag experienced in a correctional system differing markedly from the dismal environment to which Fisher needed to adapt in order to survive. *Concrete Mama: Prison Profiles from Walla Walla* (University of Washington Press, 2d ed. 2018). Experts worry about public safety if Fisher is released. Still, *Haag* shows that Fisher is now serving a de facto life sentence without any court having determined that he was irreparably depraved in 1979. The State will not even agree to a resentencing during which Fisher could present his own expert witnesses for review by the court. Fisher has yet to benefit from the requirement that a judge determining release must focus on the mitigating factors of youth.

The State mentions the 1979 juvenile court's finding at the time of its decline of juvenile court jurisdiction. The juvenile court noted that Fisher lived away from home and worked. The State, with this comment, may wish to promote Fisher, at age seventeen, as an adult. *State v. Bassett* addresses such an argument. Living on one's own does not mean maturity. Later one dissenting Washington Supreme Court justice also acknowledged the discord between attributing maturity with living on one's own. The dissenter characterized the trial court's conclusion as a "profound misinterpretation of the evidence." *State v. Anderson*, 200 Wn.2d 266, 302 (2022) (Gonzalez, C.J., dissenting).

The State claims Curtis Fisher committed cold-blooded murder. Nevertheless, Fisher pled guilty to second degree murder, not first degree premeditated murder. More importantly, a finding that the juvenile offender committed murder deliberately and with

34

premeditation means little when determining whether the crime resulted from transient

immaturity. *Commonwealth v. Batts*, 640 Pa. 401, 163 A.3d 410, 437 (2017), *abrogated*

*by Jones v. Mississippi*, 593 U.S. 98, 141 S. Ct. 1307, 209 L. Ed. 2d 390 (2021). Such a

finding would require an imposition of life without parole on any juvenile offender

convicted of first degree murder. *Commonwealth v. Batts*, 163 A.3d 410, 437 (2017).

The most egregious facts presented by a particular case cannot automatically negate a

juvenile homicide offender's right to resentencing under the *Miller* factors. *State v.*

*Ramos*, 187 Wn.2d 420, 438 (2017). Instead, all doubts should be resolved in favor of

conducting a *Miller* hearing.

In his findings justifying declination from juvenile court, Yakima County Superior

Court Judge Bruce Hanson wrote:

> That the juvenile [Curtis Fisher] appears to be mature for his age at
> times while at other times he appears to be immature. That the juvenile
> appears to behave in a mature manner when with adults and to behave in an
> immature manner when with younger people.

CP at 23. This passage shows Fisher succumbed to peer pressure, a factor commensurate

with intransient immaturity.

Assuming Curtis Fisher to be unrehabilitated, Washington's criminal justice, by

sentencing him as an adult to an adult prison, shares blame with Fisher for any failure to

reform. Imprisonment results in a traumatic and dangerous existence, not a learning and

maturation experience. Washington State has only recently adopted other state and

national efforts to reform policies that incarcerate youth and young adults in the adult

criminal system. *State v. Reynolds*, 2 Wn.3d 195, 218 (2023) (Whitener, J., dissenting).

In 2019, the Washington State Legislature wrote:

> The legislature acknowledges that transferring youth and young adults to the adult criminal justice system is not effective in reducing future criminal behavior. Youth and young adults incarcerated in the adult criminal justice system are more likely to recidivate than their counterparts housed in juvenile facilities.

LAWS OF 2019, ch. 322, § 1. Curtis Fisher entered the prison system at age 17 and has remained incarcerated since.

Court decisions fail to mention that incarceration decreases one's life expectancy. Michael Massoglia & William Alex Pridemore, *Incarceration and Health*, 41 ANN. REV. SOCIO. 291 (2015). According to a study conducted by Vanderbilt University and data from New York, for every year spent behind bars, overall life expectancy decreases two years. Evelyn J. Patterson, *The Dose–Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 Am. J. Pub. Health 523 (2013); Nick Straley, Miller*'s Promise: Re-Evaluating Extreme Criminal Sentences for Children*, 89 WASH. L. REV. 963, 986 n.142 (2014).

I already concluded that Curtis Fisher's sentence fails constitutional muster under the categorical bar analysis. Fisher's sentence also falls under the *Fain* proportionality test, as applied in *State v. Bassett*. Second degree murder is a serious offense, but less so that the three counts of aggravated first degree murder committed by Brian Bassett. The legislative purpose factor weighs in favor of serious punishment. But the third factor, the punishment juveniles would receive in other jurisdictions, weighs in favor of finding

36

forty-five years in prison cruel and unconstitutional punishment. The fourth factor directs the court to look at the punishment juveniles would receive for other offenses in the same jurisdiction. Juveniles in Washington otherwise face life without parole for aggravated first degree murder. The 1979 sentencing court could have sentenced Fisher to a maximum of thirty years instead of a lifetime. Because of Fisher's juvenility, the four decades serves no penological purpose.

DISPROPORITIONALITY TO SRA SECOND DEGREE MURDER SENTENCE

I have already concluded that the categorical bar analysis and the *Fain* proportionality test demand release of Curtis Fisher from prison. I move now to two other disproportionate sentence analyses. First, Fisher's unrelenting sentence is disproportionate to a sentence meted on even an adult since 1984. Second, Fisher's treatment is disproportionate to the treatment of other youth who committed aggravated first degree murder.

The State fails to recognize that Curtis Fisher's assertion of cruel punishment does not rest solely on his youth at the time of his crime. Fisher also emphasizes the quirks in the pre-SRA sentencing law when compared to sentencing reform act statutes. His 1979 sentence of life imprisonment violates the grossly disproportionate element of the cruel punishment clause of the Washington constitution when compared to current adult sentences for second degree murder.

In 1981, the Washington State Legislature replaced the state's indeterminate sentencing system, under which the superior court sentenced Curtis Fisher, with a

determinate sentencing scheme with the SRA. To repeat, before the implementation of

the SRA, the trial court sentenced an offender to the maximum amount of time that could

be served for the crime. In turn, the Board of Prison Terms and Paroles established the

minimum term and governed the amount of time the offender would actually serve. The

Board possessed the authority to decide when to release the offender from incarceration.

Curtis Fisher was sentenced under the indeterminate sentence scheme, which has resulted

in his unending imprisonment.

The SRA applies to crimes committed after June 30, 1984. RCW 9.94A.905. The

SRA imposed a regime of structured discretion for the courts. *State v. Hubbard*, 1 Wn.3d

439, 445, 527 P.3d 1152 (2023). The act eliminated parole hearings for most offenders.

The SRA created the ISRB and directed the Board to attempt to render parole decisions,

for those sentenced under the former indeterminate sentencing system still incarcerated

after June 1984, reasonably consistent with the SRA, including standard ranges imposed

in the SRA. RCW 9.95.009(2). The ISRB replaced the Board of Prison Terms and

Paroles. RCW 9.95.001.

The SRA did not apply its new sentencing ranges to pre-act offenses. Also,

nothing in RCW 9.95.011 requires a court to follow SRA sentencing procedures. *In re*

*Personal Restraint of Whitesel*, 111 Wn.2d 621, 635, 763 P.2d 199 (1988). Nevertheless,

the transition statute of RCW 9.95.009(2) instructed the Board to consider the purposes,

standards and sentencing ranges set for in the SRA and to attempt to make its decisions

regarding pre-SRA offenders reasonably consistent with SRA ranges and standards. *In re*

*Personal Restraint of Irwin*, 110 Wn.2d 175, 178-79, 751 P.2d 289 (1988). In reviewing minimum terms of such offenders, the Board must impose sentences reasonably consistent with the SRA. *In re Personal Restraint of Myers*, 105 Wn.2d 257, 263, 714 P.2d 303 (1986).

No evidence suggests that the ISRB has attempted to follow the SRA with regard to the second degree murder conviction of Curtis Fisher. The State does not argue to the contrary. Thus, the ISRB fails to comply with this important section of the SRA.

A court performs sentencing, under the SRA, through a grid that supplies a range of months for the offender depending on the level of seriousness of the pending conviction and the defendant's offender score. The court calculates the offender score by counting the prior and current felony convictions in accordance with the rules for each offense. RCW 9.94A.525. The offender score is the sum of points accrued under RCW 9.94A.525 rounded down to the nearest whole number. A backdrop to the sentencing range is the maximum sentence for the classification of the crime, which maximum is almost always significantly higher than even the high end of the standard range.

Second degree murder is a class A felony. RCW 9A.32.050(2). The maximum sentence for a class A felony, under the sentencing reform act, is life imprisonment. RCW 9A.20.021(1)(b). Nevertheless, although the law of cruel punishment speaks in terms of the maximum sentence for a crime as the measuring factor for disproportionate sentences, courts consider actual sentencing practices in its inquiry of constitutionality.

*Graham v. Florida*, 560 U.S. 48 (2010); *Roper v. Simmons*, 543 U.S. 551, 572 (2005).

Penalties actually imposed provide a more accurate picture of the legal landscape for

purposes of cruel punishment. *State v. Santiago*, 318 Conn. 1, 122 A.3d 1, 22 (2015).

Punishments implicating the Eighth Amendment include the sentences actually handed

down by the sentencing courts. *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

In this appeal, the State employs the high end of Curtis Fisher's standard range, not the

maximum possible sentence, when assessing disproportionality.

In 1979, the superior court sentenced Curtis Fisher to a lifetime of imprisonment

with the possibility, but not certainty, of parole. Under the SRA, a sentencing court

cannot impose an indeterminate sentence of a maximum of life imprisonment for second

degree murder. Second degree murder bears a serious level of XIV for purposes of the

sentencing grid. According to Fisher, the standard range sentence for one convicted of

second degree murder, who has an offender score of one, is 134 to 234 months, or

nineteen years and six months. RCW 9.94A.505; RCW 9.94A.510; RCW 9.94A.515;

RCW 9.94A.525; RCW 9.94A.530. Br. of Resp't at 4-5. Thus, if he committed the

murder five years later at a more mature age, he would have only been sentenced, under

Fisher's calculation, to at most nineteen years and six months.

The State supplies an even lower sentence calculation. According to the State,

Fisher had two earlier juvenile felony convictions, second-degree burglary and taking a

motor vehicle without permission. Under the 1984 Sentencing Guidelines his offender

40

score would be one point, a half-point for each of the nonviolent felonies. In turn, his sentencing range would have been 134 to 178 months or 11.16 to 14.83 years.

Under his calculation, Curtis Fisher would have been released from prison in early 2004, and, under the State's measurement, Fisher would have been released from prison in 1999 even on the assumption that his crime occurred five years later and regardless of the ISRB's view of a lack of rehabilitation. According to Fisher's math, he has now spent 536 months in prison, which is 2.29 times the highest sentence in his standard range. Under the State's arithmetic, Fisher has served 3.01 times the highest point in his standard range. This result shocks the conscience and violates anyone's standard of fairness. The law should evolve towards humaneness, not toward harshness. Had Fisher committed his crimes today, his sentencing range would be even lower considering that adjudications of guilt pursuant to Title 13 RCW, which are not murder in the first or second degree or Class A felony sex offenses, may not be included in the offender score. RCW 9.94A.525(1)(b).

Statutory revisions may render a punishment constitutionally disproportionate and cruel. *Wells-Yates v. People*, 2019 CO 90M, 454 P.3d 191, 206 (Colo. 2019). Consideration of the statutory changes is the most valid indicia of a state's evolving standards of decency. *Humphrey v. Wilson*, 282 Ga. 520, 652 S.E.2d 501, 507 (2007). During a proportionality review, the court should consider any relevant legislative amendments enacted after the dates of those offenses, even if the amendments do not apply retroactively. *People v. McRae*, 2019 CO 91, 451 P.3d 835, 839 (Colo. 2019).

41

Punishments that did not seem cruel and unusual at one time may, in the light of reason and experience, be found cruel and unusual at a later time. *Graham v. Florida*, 560 U.S. 48, 85 (2010) (Stevens, J., concurring).

Some Washington decisions illustrate the grossly disproportionate second degree murder sentence imposed on Curtis Fisher of forty-years and counting. In *State v. Gilmer*, 96 Wn. App. 875, 981 P.2d 902 (1999), the superior court sentenced George Gilmer to 212 months, or 17.3 years, for second degree felony murder. In *State v. Gregg*, 196 Wn.2d 473, 474 P.3d 539 (2020), the superior court sentenced Sebastian Gregg to 37 years for first degree murder, burglary, and arson. In *In re Personal Restraint of Hinton*, 1 Wn.3d 317 (2023), James Hinton received a thirty-seven-year sentence for second degree murder and attempted murder committed at age seventeen.

Because of Curtis Fisher's sentence grossly exceeding what his sentence would be today, I have not exhaustively researched the penalties imposed in other states for second degree murder. Shorter sentences in some jurisdictions are not dispositive. *State v. Moretti*, 193 Wn.2d 809, 833, 446 P.3d 609 (2019). Nevertheless, I note that in Arizona, second degree murder is punishable for up to twenty-five years. ARIZ. REV. STAT. ANN. § 13-1104. In Arkansas, the penalty is between 6 to 30 years. ARK. CODE ANN. § 5-10-103. Florida penalizes second degree murder with up to thirty years in prison. FLA. STAT. § 782.04.

In *People v. Elizondo*, 2021 IL App (1st) 161699, 191 N.E.3d 677, 455 Ill. Dec. 370, the State convicted Alvaro Elizondo with second degree murder. He received, under

Illinois statute, a twenty-four-year prison term. Ordinarily second degree murder in Illinois carried a sentencing range of nine to twenty years, but, based on Elizondo's criminal record, the court raised the penalty to twenty-four years.

In *State v. Suskiewich*, 2016-NMCA-004, 363 P.3d 1247 (2015), the defendant was convicted of second degree murder and given a sentence of twelve years. Under a New Mexico statute, the basic sentence for second degree murder was fifteen years. NMSA 1978, § 30-2-1(B) (1994).

The majority writes that Curtis Fisher's forty-five year and counting prison sentence cannot be considered a grossly disproportionate sentence because the sentence is tied to his lack of rehabilitation in prison. The majority cites no law for the proposition that the failure to rehabilitate in prison transforms a disproportionate sentence into a permissible sentence.

In short, when a child commits the crime of murder, the federal and state constitutions, the enactments of the Washington State Legislature, and Washington case law demand that the sentencing court treat the child differently from an adult. *State v. Haag*, 198 Wn.2d 309, 312 (2021). Curtis Fisher's sentence treats him far worse than how the law now treats adults.

## DISPROPORTIONALITY TO AGGRAVATED FIRST DEGREE MURDER FOR JUVENILES

The State did not convict Curtis Fisher of the most serious crime of aggravated first degree murder. The State convicted him of a crime two steps lower, second degree

43

murder. Two of the trio of *Miller*-fix statute sections, RCW 10.95.030 and .035, address one who received a life without the opportunity of parole sentence when committing aggravated first degree murder below the age of eighteen. I previously cited the two statutes. RCW 10.95.035 grants the offender the right to resentencing before a superior court, during which hearing his transient immaturity at the time of the crime controls the resentencing outcome. Whether he might commit another crime has little, if any, bearing. But uniquely, one who commits a lesser offense that did not warrant a life without parole sentence receives no rehearing before the superior court. Instead, because of a second degree murder conviction, Fisher can only gain release by convincing a majority of the ISRB of his rehabilitation and unlikelihood of committing any new crime. This sentencing scheme is backwards.

RCW 9.94A.730(3) demands that the ISRB "give public safety the highest priority when making all discretionary decisions regarding the ability for release and conditions of release." If Curtis Fisher had been sentenced under the sentencing reform act, he would have been released at the end of sentence regardless of public safety. The statute grants the Board discretion when granting or denying release, whereas a determinate sentence affords no discretion to any agency. For pre-SRA prisoners, the ISRB can make decisions about release "'for a variety of reasons and [such decisions] often involve no more than informed predictions as to what would best serve correctional purposes or the safety and welfare of the inmate.'" *In re Personal Restraint of Dyer*, 157 Wn.2d 358, 363, 139 P.3d 320 (2006), quoting *Meachum v. Fano*, 427 U.S. 215, 225, 96 S. Ct. 2532,

44

49 L. Ed. 2d 45 (1976). In other words, the ISRB engages to some extent in guesswork. No mathematical formula aids in rendering a decision, and no set of facts mandates a decision favorable to the offender. *In re Personal Restraint of Dodge*, 198 Wn.2d 826, 844, 502 P.3d 349 (2022).

RCW 9.94A.010(1) lists one of the purposes behind Washington's criminal justice system is to ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history. This purpose must extend to a lesser or equal, but not greater, punishment for others committing more serious crimes.

The fourth and final factor we consider when undergoing the *Fain* proportionality analysis is the punishment imposed for similar offenses in the same jurisdiction. *State v. Ritchie*, 24 Wn. App. 2d 618, 647, 520 P.3d 1105 (2022), *review denied*, 1 Wn.3d 1006, 526 P.3d 851 (2023). To repeat, the phenomenon of a more severe crimes carrying a less severe sentence suggests disproportionality, particularly when considering the penalties imposed for other crimes with similar characteristics to the crime at issue. *State v. Lara-Vasquez*, 310 Or. App. 99, 108 (2021).

I previously reviewed the facts in *State v. Haag*, 198 Wn.2d 309 (2021). A jury convicted Timothy Haag of aggravated first degree murder committed while a teen. Haag received a new resentencing, under RCW 10.95.030 and .035, during which the resentencing court failed to emphasize the mitigating nature of Haag's youth and instead underscored the need for retribution. The Supreme Court readily reversed.

45

*Haag* illustrates the disparate treatment of youth convicted of second degree murder from those convicted of aggravated first degree murder. Appellate review of a resentencing under RCW 10.95.030 is strict and favorable to the offender, whereas the appellate courts reticently overturn a release decision by the ISRB. *State v. Delbosque*, 195 Wn.2d 106, 456 P.3d 806 (2020) also illustrates the Washington Supreme Court has aggressively reviewed a trial court decision under RCW 10.95.035 to determine if the court truly applied the *Miller* factors and if the crime and the offender were permanently incorrigible and irretrievably depraved. The Supreme Court recognizes that irreparable corruption is rare. *State* v. *Bassett*, 192 Wn.2d 67, 89 (2018). The prohibition on juvenile life without parole sets a high standard for concluding that a juvenile is permanently incorrigible. *State v. Delbosque*, 195 Wn.2d 106, 118 (2020). Under the ISRB regime, Fisher does not get the benefit of this presumption even though he committed a lesser crime.

Even offenders convicted of first degree murder, rather than aggravated first degree murder, receive lower sentences than Curtis Fisher. In *In re Personal Restraint of Dodge*, 198 Wn.2d 826 (2022), the trial court convicted David Dodge of first degree murder, rape and burglary for crimes committed when he was 17 years old. The superior court sentenced Dodge under the sentencing reform act and meted a sentence of fifty years in prison. The Department of Corrections will need to release Dodge after five more years regardless of his rehabilitation. In five more years, Curtis Fisher will have

spent fifty years in prison, with perhaps no end in sight, despite committing a lesser crime.

The State blames Curtis Fisher for failing to identify at what time his sentence became grossly disproportionate. The difficulty in identifying the exact year, month, day, hour, or second at which time the sentence passed from being constitutional to unconstitutional should not detract from a ruling that 44 years is disproportionate. At some time before the present, the sentence passed that illegitimate line.

TIME BAR

The State erects many barriers to Curtis Fisher's resentencing by the superior court. First, the State argues that a time bar precludes any relief. Second, the State contends that Fisher enjoys an alternate remedy. Third, the State maintains that Fisher has suffered no prejudice because he cannot prove the 1979 Yakima County Superior Court judge would have imposed any different sentence other than a maximum life sentence with the possibility of parole. Fourth, the State insists that Fisher challenges a maximum penalty, which penalty is not subject to review for disproportionate sentencing. Fifth and finally, the State contends Fisher seeks an impermissible determinative sentence. I address these obstacles in such order.

Most, if not all obstacles, collapse when considering that they apply only to challenges based on the offender's youth. Curtis Fisher challenges his life sentence not only on the basis of his youth but on the independent grounds of the gross disproportionality of his sentence to those convicted of second degree murder since 1984

and the distorted beneficial treatment granted those convicted of aggravated first degree

murder over those convicted of second degree murder.

Curtis Fisher filed his motion to vacate sentence in 2020, forty-one years after his

sentencing. The State thus contends the limitation period bars the motion.

The personal restraint petition time bar lies in RCW 10.73.090. The statute

declares:

> (1) No petition or *motion* for collateral attack on a judgment and
> sentence in a criminal case may be filed more than one year after the
> judgment becomes final if the judgment and sentence is valid on its face
> and was rendered by a court of competent jurisdiction.
> (2) For the purposes of this section, "collateral attack" means any
> form of postconviction relief other than a direct appeal. "Collateral attack"
> includes, but is not limited to, a personal restraint petition, a habeas corpus
> petition, *a motion to vacate judgment*, a motion to withdraw guilty plea, a
> motion for a new trial, and a motion to arrest judgment.

(Emphasis added.) A related statute lists some exceptions to the one-year limitation

period, one of which exception Curtis Fisher forwards. RCW 10.73.100 reads:

> The time limit specified in RCW 10.73.090 does not apply to a
> petition or motion that is based solely on one or more of the following
> grounds:
> . . . .
> (6) There has been a *significant change in the law, whether
> substantive or procedural*, which is material to the conviction, sentence, or
> other order entered in a criminal or civil proceeding instituted by the state
> or local government, and either the legislature has expressly provided that
> *the change in the law is to be applied retroactively*, or a court, in
> interpreting a change in the law that lacks express legislative intent
> regarding retroactive application, determines that sufficient reasons exist to
> require retroactive application of the changed legal standard.

(Emphasis added.)  The statutory exception requires that the change in law apply retroactively.  Note that RCW 10.73.100 does not require that the collateral attacker file his motion or petition within one year of the significant change in law.

Curtis Fisher contends he fulfills the change in law exception because *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), reformed the law and the Washington Supreme Court has declared the teachings of *Houston-Sconiers* to apply retroactively.  *In re Personal Restraint of Ali*, 196 Wn.2d 220, 226 (2020).  I agree.  I also conclude that *State v. Haag*, which deems Fisher's forty plus years and counting indeterminate unconstitutional, should apply retroactively because of its substantive ruling prohibiting a life sentence for youthful offenders.

In *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), our Supreme Court held that the Eighth Amendment, *Miller v. Alabama*, and *Montgomery v. Louisiana* prohibit a court from imposing any criminal sentence on a juvenile without the court considering the juvenile's transient immaturity.  The decision demanded that the sentencing court recognize children as different.  In effectuating this substantive standard, the Washington Supreme Court announced two new procedural rules.  First, the sentencing court "must consider mitigating qualities of youth at sentencing."  *State v. Houston-Sconiers*, 188 Wn.2d 1, 21 (2017).  These mitigating qualities include a juvenile defendant's age, immaturity, impetuosity, and failure to appreciate risks and consequences.  Second, the sentencing court "must have discretion to impose any sentence below the otherwise

49

applicable" sentencing range and any sentencing enhancement. *State v. Houston-Sconiers*, 188 Wn.2d 1 21 (2017).

In 2020, the Washington Supreme Court, in companion cases *In re Personal Restraint of Ali*, 196 Wn.2d 220 (2020) and *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255 (2020) addressed whether the requirements of *Houston-Sconiers* apply retroactively on collateral review. The court held that *Houston-Sconiers* constituted a significant and material change in the law that required retroactive application. Thus, a personal restraint petitioner could raise a *Miller* and *Houston-Sconiers* violation despite filing the petition more than one year after sentencing.

Nothing in either *Ali* or *Domingo-Cornelio* suggested that any of the rulings in *Houston-Sconiers* did not enjoy retroactive effect. In *In re Personal Restraint of Ali*, the Washington high court applied retroactively all components of the *State v. Houston-Sconiers* ruling to offenders such as Curtis Fisher, sentenced before issuance of the Supreme Court's decision in *Houston-Sconiers*. *Houston-Sconiers* followed *Miller v. Alabama* and its progeny, which centered on the substantive guaranty of the Eighth Amendment: punishment proportionate to culpability. To that end, the court must, on a showing of prejudice, resentence the offender and, on resentencing, consider all mitigating circumstances related to the defendant's youth.

In steps that thwart the promise of *Miller v. Alabama*, the Washington Supreme Court has since characterized *Houston-Sconiers* as entailing procedural and substantive aspects. In turn, the state high court has limited retroactivity to the substantive ruling in

*Houston-Sconiers*, despite RCW 10.73.100(6) referencing both procedural and substantive changes in the law.

The Washington Supreme Court, in *In re Personal Restraint of Forcha-Williams*, 200 Wn.2d 581, 520 P.3d 939 (2022), dissected the *Houston-Sconiers* ruling into one substantive rule that bars standard adult SRA ranges as being disproportionate punishment for juveniles who possess diminished capacity. In turn, the high state court identified and separated from the substantive rule two *Houston-Sconiers* procedural rules. First, sentencing courts must consider the mitigating qualities of youth. Second, courts must possess discretion to impose sentences below what the SRA mandates. The court characterized a procedural *Houston-Sconiers* violation as not necessarily causing the offender prejudice.

In Curtis Fisher's appeal, the State argues that *In re Personal Restraint of Forcha-Williams* held that a procedural *Houston-Sconiers* violation is not subject to retroactivity. But the Supreme Court did not venture that far. The Supreme Court instead, in a 5 to 4 ruling, only declared that a procedural violation does not constitute per se prejudice. *Forcha-Williams* did not hold that a procedural violation cannot be applied retroactively. The Supreme Court dismissed Derrius Forcha-Williams' personal restraint petition because, despite the State conceding *Houston-Sconiers* procedural violations, Forcha-Williams failed to establish that, if the sentencing court had considered the *Miller* mitigating factors and exercised its unlimited discretion, it would have imposed a lower sentence. In part, the Supreme Court relied on the harsh words uttered by the superior

51

court during the sentencing hearing and the court having mentioned Forcha-Williams'

youth as suggesting a resentencing would not change the outcome.

Assuming *In re Personal Restraint of Forcha-Williams* stood for the principle that

procedural rules arising from *Houston-Sconiers* do not survive the one-year time bar, the

majority ruling must be criticized. The symbiotic procedural and substantive aspects of

*Houston-Sconiers* do not subsist without one another. The procedural aspect of the

decision lacks any importance but for the substantive aspect of gaining a lower sentence.

The substantive aspect cannot be fulfilled without the procedure of reviewing evidence of

immaturity and possessing discretion to resentence based on juvenile immaturity. Under

state law, courts do not usually apply a new procedural rule retroactively. But, if a

substantive constitutional rule coincides with a crucial procedural mechanism that

implements that substantive rule, that procedural mechanism must also apply

retroactively. *In re Personal Restraint of Ali*, 196 Wn.2d 220, 240 (2020).

The four dissenters, in *In re Personal Restraint of Forcha-Williams*, observed that

the majority strayed from the court's decision, in *In re Personal Restraint of Domingo-*

*Cornelio*, that a PRP petitioner shows actual and substantial prejudice by identifying a

violation of only one of the *Houston-Sconiers* mandates. In fact, the dissent in *Domingo-*

*Cornelio* had faulted the majority for recognizing the importance of both of the dual

mandates. The dissent, in *Forcha-Williams*, also concluded that Derrius Forcha-Williams

showed prejudice because, although the resentencing court referred to Forcha-Williams

52

as a young man, the court never explored the implications of Forcha-Williams'

immaturity, impetuosity, and inability to understand risks.

*In re Personal Restraint of Carrasco*, 1 Wn.3d 224 (2023) followed *In re Personal*

*Restraint of Forcha-Williams*. Erik Carrasco Ramos served a 93-year sentence imposed

in 2012 without any consideration of his youth. In April 2010, while a gang member and

at the age of 17, he committed second degree murder, four counts of first degree assault,

and second degree unlawful possession of a firearm. In 2018, Carrasco filed a personal

restraint petition that sought resentencing. The Supreme Court accepted the State's

contention that Carrasco enjoyed an alternative remedy to resentencing under RCW

9.94A.730(1) due to the statutory presumption of release by the ISRB after serving

twenty years of confinement. In doing so, the court followed *Forcha-Williams*'

distinction between the procedural and substantive aspects of *Houston-Sconiers*.

Three dissenters in *In re Personal Restraint of Carrasco* wisely criticized the

attempt to distinguish between the procedural requirements and substantive requirements

of *Houston-Sconiers*. Both requirements must be applied retroactively because the two

intertwine. A court cannot determine whether a youth offender's sentence substantively

violates the cruel punishment clause without engaging in the procedure of analyzing the

*Miller* factors and then exercising discretion to resentence the youth. The procedures of

reviewing the *Miller* factors and exercising resentencing discretion serve no purpose

except to enforce the promises and protections of the cruel punishment clause. *Houston-*

*Sconiers* never separated its rulings into distinct categories for purposes of retroactivity.

The erroneous rulings in *In re Personal Restraint of Carrasco* and *In re Personal Restraint of Forcha-Williams* do not harm Curtis Fisher. Despite the imperative of this intermediate appellate court following Washington Supreme Court precedent, the State fails to recognize that Fisher, although accusing his sentencing court of violating the procedures established in *Houston-Sconiers*, principally relies on the substantive rule announced in *Houston-Sconiers*. Fisher's 1979 sentencing court breached the cruel punishment clause when imposing a standard adult sentence and a de facto life sentence on a juvenile with diminished capacity.

Curtis Fisher's argument also relies on the new substantive principle announced in *State v. Bassett*, 192 Wn.2d 67 (1998) that imposing a life sentence on a youth without a finding of irreparable depravity constitutes cruel punishment. The *Bassett* rule, as a substantive rule, must also apply retroactively in favor of Fisher. Finally, Fisher relies on a combination of the *Bassett* and *Houston-Sconiers* substantive rulings to the effect that he need not show rehabilitation in order to gain release from prison.

The State fails to recognize that Curtis Fisher's assertion of cruel punishment also does not rest solely on his youth at the time of his crime. Fisher also emphasizes the quirks in the pre-SRA sentencing law when compared to sentencing reform act statutes. His 1979 sentence of life imprisonment violates the grossly disproportionate element of the cruel punishment clause of the Washington Constitution. His sentence only recently became a de facto life sentence because of the running of time without release from incarceration.

54

If the petitioner asserts multiple claims after the one-year period expires and if at least one of the claims is time barred, the petition must be dismissed. *In re Personal Restraint of Williams*, 200 Wn.2d 622, 632, 520 P.3d 933 (2022). Although Curtis Fisher advances a handful of nuanced arguments, they all derive from the principal assertion that his sentence violates Washington's cruel punishment clause. The State does not characterize Fisher's motion as a mixed petition.

To repeat, Curtis Fisher also asserts that his sentence now amounts to a grossly disproportionate sentence and thus is unconstitutional regardless of the sentence being imposed while a youth. A challenge based on cruel and unusual punishment presents a challenge to an illegal sentence, which is not subject to any limitation period for postconviction relief. *State v. Ragland*, 812 N.W.2d 654, 656 (Iowa 2012).

## ALTERNATIVE REMEDY

The State seeks to defeat Curtis Fisher's motion with the availability of an alternative remedy. A court will grant relief by a personal restraint petition only if other remedies available to the petitioner are inadequate under the circumstances. RAP 16.4(d).

The State argues that Washington's *Miller*-fix statute, RCW 9.94A.730, affords an adequate remedy because it allowed Curtis Fisher to petition for early release after serving twenty years of his lifetime sentence. Not true.

RCW 9.94A.730 declares:

(1) Notwithstanding any other provision of this chapter, *any person convicted of one or more crimes committed prior to the person's eighteenth birthday* may petition the *indeterminate sentence review board* for early release after serving no less than twenty years of total confinement, provided the person has not been convicted for any crime committed subsequent to the person's eighteenth birthday, the person has not committed a disqualifying serious infraction as defined by the department in the twelve months prior to filing the petition for early release, and the current sentence was not imposed under RCW 10.95.030 [aggravated first degree murder] or 9.94A.507 [certain sex offenders].

. . . .

(3) . . . The board shall order the person released under such affirmative and other conditions as the board determines appropriate, unless the board determines by a preponderance of the evidence that, despite such conditions, *it is more likely than not that the person will commit new criminal law violations if released*. The board shall give public safety considerations the highest priority when making all discretionary decisions regarding the ability for release and conditions of release.

. . . .

(6) An offender whose petition for release is denied may file a new petition for release five years from the date of denial or at an earlier date as may be set by the board.

(Emphasis added.)

At the outset, RCW 9.94A.730 only provides relief to youthful offenders confined under the sentencing reform act, Chapter 9.94A. RCW. In recognizing such, the ISRB does not accept petitions for early release from pre-SRA offenders such as Curtis Fisher, who already fall under the ISRB's jurisdiction.

Curtis Fisher has remained imprisoned for over four decades due to the ISRB's application of RCW 9.95.100, which unlike the *Miller*-fix statutes, does not afford a presumption of release. Instead, the ISRB decides an offender's fate based on a variety

of reasons, and such decisions entail no more than informed predictions of best serving correctional purposes. *In re Dyer*, 157 Wn.2d 358, 363, 139 P.3d 320 (2006).

## PREJUDICE

The State presents one more excuse not to follow the promise of *Miller* by arguing that Curtis Fisher fails to show that, if the 1979 sentencing court had considered the mitigating factors of youth, the judge would have imposed a lesser maximum sentence of life imprisonment. This argument places an undue and unfair burden on someone subjected to an unconstitutional sentence. The Kafkaesque argument fails to recognize that no judge in 1979 considered brain science not developed until this century. The argument also fails to note that a reasonable judge, who now understands brain science, would likely impose a lower sentence on Fisher after performing his or her constitutional duty to thoroughly consider the immaturity, impetuosity, recklessness, and tragic background of the seventeen-year-old Fisher.

To be awarded relief, a personal restraint petitioner must show, by a preponderance of evidence, actual and substantial prejudice by the constitutional error. *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 267 (2020). Thus, Fisher must show his initial sentencing more likely than not would have been shorter had the alleged error not occurred. *In re Personal Restraint of Meippen*, 193 Wn.2d 310, 316, 440 P.3d 978 (2019). Actual and substantial prejudice is not limited to circumstances when defense counsel makes an argument not legally available and the sentencing court explicitly states that it cannot deviate from sentencing rules. *In re Personal Restraint of*

57

*Domingo-Cornelio*, 196 Wn.2d 255, 267 (2020). The movant establishes sufficient

prejudice if the sentencing court failed to consider mitigating factors related to

youthfulness. *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 268

(2020).

Under other settings of constitutional violations, such as ineffective assistance of

counsel, the defendant, to establish prejudice, must "prove that there is a reasonable

probability that, but for counsel's deficient performance, the outcome of the proceedings

would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

This principle suggests that the accused must establish that he likely would have been

acquitted. Nevertheless, the standard is lower than a preponderance standard. *State v.

Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). A reasonable probability is a

"probability sufficient to undermine confidence in the outcome." *State v. Gregory*, 192

Wn.2d 1, 22, 427 P.3d 621 (2018). A court could lack confidence in the outcome without

concluding that the defendant likely would have been acquitted without the constitutional

breach.

Contrary to other constitutional claims, no Washington court has modified the

standard applied to personal restraint petition challenges to sentencing by stating that the

standard is less than a preponderance. No court has ruled that the reviewing court need

only maintain an undermined confidence in whether the sentencing court would have

imposed the same sentence. I discern no valid reason to decline to impose the

undermined confidence standard in the setting of cruel and unusual punishment clause

challenges to lengthy juvenile sentences. The cruel and unusual punishment clause holds

as much importance as other constitutional provisions. Regardless, I need not employ the

lesser standard to rule in Curtis Fisher's favor.

The three dissenters, in *In re Personal Restraint of Carrasco*, 1 Wn.3d 224 (2023),

sagely noted the need for trial courts, not the ISRB, to resentence all youth, even those

sentenced as an adult. Every personal restraint petitioner shows prejudice when his or

her sentencing court failed to sentence under the *Miller* factors and failed to comply with

the procedural and substantive mandates of *Houston-Sconiers*. Therefore, a reviewing

court cannot know if the sentencing court appropriately imposed an adult standard range

on the juvenile offender. A reviewing court cannot be sure if the original sentence was

unconstitutionally disproportionate unless a resentencing court follows the dual mandates

of *Houston-Sconiers*.

In *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), the Washington Supreme

Court, without extensive analysis, held that two offenders suffered prejudice even though

defense counsel at sentencing argued mitigating factors based on youth. The Washington

Supreme Court remanded the two combined cases for resentencing.

In *In re Personal Restraint of Ali*, 196 Wn.2d 220 (2020), the Washington

Supreme Court held that the offender demonstrated actual and substantial prejudice.

Seventeen-year-old Said Ali committed numerous robberies and a first degree assault.

The State requested a high-end standard sentence of 390 months. Ali's defense counsel

requested an exceptional downward sentence of ten years. Counsel emphasized that Ali

was a young adolescent at the time of the crimes and little would be gained by crushing his hope and spirit by sending him away for two lifetimes, which the State sought. Ali presented letters and testimony from members of his community, who referenced his age, inexperience, and susceptibility to peer pressure. The sentencing judge ruled that she lacked the discretion to impose an exceptional sentence downward based on those mitigating factors.

In *In re Personal Restraint of Ali*, the Washington Supreme Court held that Said Ali had demonstrated prejudice by a preponderance of the evidence. The sentencing judge imposed 312 months, the minimum sentence she had discretion to impose under the SRA. The high court remanded the case for resentencing. In *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255 (2020), the Supreme Court also remanded for resentencing because the sentencing judge had ordered the lowest possible sentence within the standard range.

I contrast *State v. Houston-Sconiers* and *In re Personal Restraint of Ali* with *In re Personal Restraint of Meippen*, 193 Wn.2d 310 (2019). In the latter case, the state high court held that sixteen-year-old Time Meippen failed to show the likelihood of a lower sentence because the sentencing court imposed a sentence in the high-end of the standard range despite recognizing the court had discretion to order a lower sentence within the standard range. Defense counsel argued for a sentence in the low-end of the standard range because the youth's age prevented him from understanding the full nature of his

robbing a store and shooting the clerk. The sentencing court deemed Meippen's actions to be cold and calculated.

The ruling in *Personal Restraint of Meippen* should be criticized. Although Time Meippen's sentencing court held discretion to impose a lower sentence and instead imposed a higher sentence in the standard range, the sentencing court still lacked any knowledge about juvenile brain development studies that scientists released only after Meippen's sentencing. Reviewing the brain studies should have significantly impacted the sentencing judge if she had sentenced Meippen years later. Just because the sentencing judge imposed a high sentence, despite discretion to the contrary, does not mean the court would not have significantly shortened the sentence after scientific enlightenment, after knowing it must consider the immaturity of the teenager when sentencing, and after understanding it must exercise discretion in possibly granting an exceptional downward sentence. A reading of recent case law could have and should have convinced the sentencing judge that it possessed complete discretion in sentencing based on new data of teenage brain development. On resentencing, the judge would have had available for the first-time instructions from the United States Supreme Court and Washington Supreme Court from the last two decades that impose a mandatory duty on the sentencing court to seriously consider the lack of maturity of a seventeen-year-old when sentencing.

The Washington Supreme Court's summary dismissal of Time Meippen's petition, based on a high sentence and based on scattered comments from the sentencing judge,

downplays the important lessons taught by United States Supreme Court in *Montgomery v. Louisiana*, 577 U.S. 190 (2016); *Miller v. Alabama*, 567 U.S. 460 (2012); *Roper v. Simmons*, 543 U.S. 551 (2005); and *Graham v. Florida*, 560 U.S. 48 (2010). The ruling against Meippen curbs the imperative created by the United States Supreme Court and the Washington Supreme Court to seriously consider the youth of the offender. The denial of Meippen's petition demeans the ability of Washington's astute superior court judges to change their minds about sentencing when faced with compelling science data and instructions from higher courts. The teachings of *Miller v. Alabama* and its United States Supreme Court and Washington Supreme Court progeny did not simply demand quantitatively changed sentences by a few months or a few years. The decisions reshaped the whole landscape of juvenile sentencing and demanded an entirely new approach to sentencing. I underwent a sea change in attitude toward juvenile sentencing when studying the scientific literature and reading the United States Supreme Court decisions.

Those facts critical to the Washington Supreme Court's denial of Time Meippen's petition are absent in Curtis Fisher's sentencing. Fisher's defense counsel, during the 1979 sentencing, never argued mitigating factors based on youth. Fisher's sentencing court did not impose a high sentence within a standard range. Instead, the court merely followed rote practice.

*In re Personal Restraint of Ali* and *In re Personal Restraint of Meippen* direct the reviewing court to decide whether the initial sentence would have been lower by

62

attempting to divine what the earlier sentencing judge would do. We do not resolve the petition by asking what the typical judge would do. Nor do we ask what the resentencing judge should do, as opposed to what the judge would likely do. One might wonder if the reviewing court should consider the reputation of the sentencing judge as a harsh or lenient sentencer, when the appeals court grants or denies the petition for resentencing. More importantly in this petition, one might wonder whether we should speculate what Curtis Fisher's initial sentencing judge would do when the judge has been dead for eighteen years and any resentencing will proceed before another judge.

Curtis Fisher's sentencing judge was Yakima County Superior Court Judge Bruce Hanson. Judge Hanson retired from the bench in 1990 and died in 2006. I many times appeared before and I tried one lengthy trial before Judge Hanson. Judge Hanson was as patient, gracious, and understanding as any judge I appeared before. He would accept and understand the vagaries of being a teenager living away from his parents. He also would follow Supreme Court instructions to consider a child's immaturity when sentencing. Any suggestion to the contrary demeans my memory of Judge Hanson.

Of course, a skeptic would consider my prediction of rulings by Judge Bruce Hanson to be speculative. One could also accuse me of catering to my personal views of another rather than relying on unbiased evidence of Judge Hanson. But any claim of speculation and bias illustrates the inanity of requiring the offender to prove to this court, on a preponderance of evidence standard, forty-five years after sentencing that the

63

sentence would have been different if the sentencing judge knew of the scientific data and the change in the law.

We can be certain that Judge Bruce Hanson did not consider the youth of Curtis Fisher when sentencing Fisher in 1979 because no judge entertained such a consideration then. Judge Hanson exercised no discretion at all, but instead followed the mandatory indeterminate sentencing statutes.

The State faults Curtis Fisher for failing to procure a transcript of the 1979 sentencing hearing or affidavits from someone present at the hearing. I question whether any transcript can be procured or whether anyone present at the hearing would have a memory of what occurred 45 years ago. Since the State seeks to establish that the court considered the *Miller* factors during the 1979 hearing, contrary to history establishing that courts never did so in 1979, it seeks to show the remarkable and the positive of some conduct. Although Fisher may have the burden of establishing prejudice, the State should bear the burden of showing that the trial court specifically contemplated a lower sentence based on Fisher's teendom since the State seeks to show the affirmative of a fact. *Gillingham v. Phelps*, 11 Wn.2d 492, 501, 119 P.2d 914 (1941). Of course, the 1979 superior court, even if it heard argument about Fisher's youth, would not have allowed the argument to influence his decision because, under indeterminate sentencing, the court only established a maximum sentence.

The State emphasizes that the superior court in its 2021 ruling granting a resentencing hearing never found actual and substantial prejudice by the alleged

64

sentencing error. Common sense dictates that all sentencing courts in 1979 did not consider the offenders youth such that error is automatic and prejudice established. Common sense dictates that the 1979 sentencing court would have issued a lower sentence to preclude a minor from a lifetime, let alone forty-four years in prison. Anyway, the superior court has yet to even conduct its resentencing hearing and any failure by the superior court to find prejudice can be addressed on remand.

## CHALLENGE OF MAXIMUM SENTENCE

The State contends that Curtis Fisher's petition challenges the maximum sentence of a lifetime in prison and under Supreme Court precedent the maximum sentence is not subject to review under a categorical bar analysis or the *Fain* proportionality test. The State cites *In re Personal Restraint of Williams*, 200 Wn.2d 622 (2022).

In 2001, Li'Anthony Williams, at age 17, pled guilty to assault in the second degree with sexual motivation and was sentenced under the indeterminate sentencing scheme for sex offenders. As of 2017, the ISRB had not found Williams to be releasable. Williams filed a personal restraint petition on the basis that his maximum term of a life sentence, under the sexual crime indeterminate sentencing scheme, was unconstitutional. The State argued that his petition was time barred under the one-year rule found in RCW 10.73.100(6). Williams responded that he based his claim on *Houston-Sconiers*, which must be applied retroactively.

The Supreme Court, in *In re Personal Restraint of Williams*, dismissed the petition as time barred because Li'Anthony Williams' sentence did not violate the *Houston-*

65

*Sconiers* substantive rule. Under the 2001 indeterminate sentencing scheme for sex offenders, the court imposes the statutory maximum term and sets the minimum term within the standard range for the offense. RCW 9.94A.507(1). After serving the minimum term, the offender remains in DOC custody until the ISRB determines the release date. The Board grants release if it determines the offender is unlikely to commit another sex offense if released.

Curtis Fisher's predicament diverges from the situation of Li'Anthony Williams. Williams' petition impacted a current indeterminate sentencing scheme under the SRA. Just as important, Fisher was sentenced twenty-two years before the sentencing of Williams. With the passage of forty-four years, Fisher's sentence has transformed into a de facto life sentence in violation of *Miller v. Alabama*, *State v. Bassett*, and *State v. Houston-Sconiers*. Under the State's theory that the maximum length in an indeterminate sentence cannot be challenged, the State could impose indeterminate life sentences for any and all crimes and thereby avoid the cruel punishment clause in total.

INDETERMINATE SENTENCE INTO DETERMINATE SENTENCE

Through his cruel punishment clause argument, Curtis Fisher seeks a ruling imposing a deadline for his release, which deadline has already passed or will arrive any day. Thus, according to the State, Fisher in essence asks for a determinative sentence. Based on *In re Personal Restraint of Forcha-Williams*, 200 Wn.2d 581 (2022), the State argues that the superior court may not convert an indeterminate life sentence to a determinate sentence for a limited number of years.

In 2015, a jury found Derrius Forcha-Williams guilty of second degree rape for an incident that occurred when he was 16 years old. Under two SRA provisions, RCW 9.94A.507(1) and (3)(b), nonpersistent offenders convicted of rape in the second degree must be sentenced to an indeterminate sentence of the maximum statutory sentence for the offense and a minimum term within the standard range for the offense. The indeterminate sentences for rape and other crimes with a sexual motivation run contrary to the determinative sentences under the SRA. This factor alone distinguishes *Forcha-Williams* from Curtis Fisher's case. The superior court sentenced Forcha-Williams to an indeterminate sentence with a minimum term of 120 months and a maximum term of life. In a collateral attack, the Court of Appeals ruled that the sentencing court possessed discretion to impose a determinate sentence to an indeterminate sentence.

The Washington Supreme Court, in a 5 to 4 decision, disagreed with the Court of Appeals in *In re Personal Restraint of Forcha-Williams*. The court read RCW 9.94A.507(1) and (3)(b) to demand an indeterminate sentence. The court then wrote that its ruling in *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017) did not grant the superior court discretion to alter an indeterminate sentence because such action would rely on the procedural aspect of the *Houston-Sconiers* decision. The maximum amount of the sentence did not raise disproportionality concerns because the offender might be released before serving the entire term.

The Supreme Court wrote in *Forcha-Williams* that "to the extent a juvenile serves additional time beyond the minimum term, that period of incarceration is directly tied to their rehabilitation, which poses no facial disproportionality issue." *In re Personal Restraint of Forcha-Williams*, 200 Wn.2d 581, 598 (2022). The court cited no case law for this proposition. The court did not struggle with the question of what happens if the juvenile serves under a maximum of a lifetime sentence and never gains release. The court did not face a sentence that had aged into a de facto life sentence. Derrius Forcha-Williams had only served seven years at the time of Supreme Court review. An offender kept indefinitely in prison under an indeterminate sentence suffers cruel punishment as much as one who has a grossly disproportionate long determinate sentence.

The four dissenters in *In re Personal Restraint of Forcha-Williams* noted that Derrius Forcha-Williams did not challenge the maximum term of his sentence, but rather his minimum term. So the majority's analysis was immaterial. The dissenters then faulted the majority for ignoring the court's precedent in *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255 (2020) and *In re Personal Restraint of Ali*, 196 Wn.2d 220 (2020). Regardless of the disregard of *Ali* and *Domingo-Cornelio*, Forcha-Williams complained of both a substantive violation and procedural violation of *Houston-Sconiers*.

When considering that Curtis Fisher argues he has already served a disproportionate sentence and should be released, Fisher does not seek a determinative

sentence. A determinative sentence imposes a date certain in the future for release. Fisher deserves release now.

Derrius Forcha-Williams' request violated a current statute. Although the 1979 court sentenced Fisher under an indeterminate sentencing scheme, that scheme has been repealed. The sentencing reform act now demands determinative sentences for second degree murder. Thus, Fisher's request does not violate current law.

## OTHER STATE CONTENTIONS

The State argues that the retroactivity rules announced in *Houston-Sconiers* do not apply to pre-SRA sentences. *In re Personal Restraint of Brooks*, 197 Wn.2d 94 (2021), a rare unanimous Supreme Court opinion on the subject of juvenile sentencing, defeats this contention. The State's argument would also implicate the equal protection clause since no rational basis could distinguish between applying *Houston-Sconiers* to juveniles sentenced before July 1, 1984 and those sentenced thereafter.

The State contends that the superior court lacks inherent authority to sentence outside the confines of the statutes. But the State does not explain why a superior court cannot grant a new sentencing hearing based on constitutional rulings by the United States Supreme Court and the Washington Supreme Court. Both courts directed sentencing courts to resentence juvenile offenders. Superior courts must possess authority to immediately release prisoners subject to a grossly disproportionate sentence.

RCW 10.95.035 directs resentencing of those convicted of aggravated first degree murder. As already mentioned, denying one convicted of second degree murder such a

69

resentencing hearing would violate the Washington State cruel punishment clause and equal protection clause. A superior court has both the power and the duty to correct an erroneous sentence. *In re Personal Restraint of Carle*, 93 Wn.2d 31, 33-34, 604 P.2d 1293 (1980). The State in essence argues that Washington lower courts cannot follow a United States Supreme Court constitutional directive or a Washington Supreme Court constitutional imperative if no Washington statute authorizes the lower court to do so.

In human terms, Curtis Fisher deserves a lengthy, if not lifetime sentence, for the killing of another human being. Fisher has often not acted admirably in prison, but he is not unique among those imprisoned in their teens. Regardless of Fisher's behavior while maturing in the department of corrections, the cruel punishment clause compels government and society to act nobly and with mercy. A lengthy sentence of despair, degradation, and dehumanization imposed on Fisher does not serve the purposes behind punishment of crime.

The ultimate value behind the United States Constitution's Eighth Amendment cruel and unusual punishment clause is the affirmation of the dignity of humankind. *Roper v. Simmons*, 543 U.S. 551, 560 (2005); *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958). The state must accept the human attributes even of those who commit serious crimes. *Graham v. Florida*, 560 U.S. 48, 59 (2010). Curtis Fisher, an immature teenager, disrespected the dignity of man and the value of life. Society,

nonetheless, need not retaliate against Fisher by disrespecting his dignity and devaluing

the entirety of the rest of his life.

      I respectfully dissent.

                                        Fearing, J.